# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00818-CV

---

### A. C., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C170123CPS, THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

---

## O P I N I O N

This is an appeal from a final order, following a bench trial, terminating the parental rights of appellant A.C. (the father) to his infant daughter, K.W. (the child). In eight issues on appeal, the father asserts that: (1)-(2) the district court lacked subject-matter jurisdiction over the case because the claims against the father were not "ripe" at the time the case was filed; (3) the evidence is legally and factually insufficient to support the district court's termination findings; (4) the father received ineffective assistance of counsel at trial; and (5)-(8) the termination proceedings violated various provisions of the United States and Texas Constitutions. We will affirm the district court's order.

## BACKGROUND

Four days after the child was born, she tested positive for methamphetamines on December 11, 2017. On that same date, the Texas Department of Family and Protective Services

(the Department) filed an "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." The parties to the suit were A.W. (the mother) and the father, who was listed in the petition as the "alleged father." Brandy Walker, the Child Protective Services (CPS) investigator assigned to the case, filed an affidavit explaining that the father was listed as an "alleged father" because the Department had been unable to establish the identity of the child's father when suit was filed. However, approximately two months after suit was filed, DNA testing confirmed that the father was the child's biological father, and the district court entered an order establishing the parent-child relationship between the father and the child on February 26, 2018.

While the case was pending, the mother signed an affidavit voluntarily relinquishing her parental rights to the child. *See* Tex. Fam. Code § 161.001(b)(1)(K). The case proceeded to a bench trial on October 25, 2018. Three witnesses testified at trial: the father; Kristen Laskiewicz, the conservatorship caseworker assigned to the case; and L.H., the father's mother (the grandmother). We will discuss their testimony below when reviewing the sufficiency of the evidence.

At the conclusion of trial, the district court took the matter under advisement and later entered an order terminating the parental rights of the father and the mother to the child. The district court found that termination of their parental rights was in the best interest of the child, that the mother had relinquished her parental rights to the child, and that the father had committed several statutory grounds for termination. *See id*. § 161.001(b)(1)(D), (E), (N), (O), (2). The father subsequently filed a motion for new trial, which the district court denied. This appeal by the father followed.

2

**ANALYSIS**

**Subject matter jurisdiction**

While his motion for new trial was pending, the father filed a plea to the jurisdiction, asserting for the first time that the district court lacked subject-matter jurisdiction over the case because the Department's claims against the father were not "ripe" when the termination suit was filed. The district court denied the plea. In his first and second issues, the father maintains that the district court lacked subject-matter jurisdiction over the case.

We will treat the father's ripeness complaint as challenging the trial court's subject-matter jurisdiction. *See Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998) ("Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented."). The basis of the father's argument is that, at the time the Department filed suit, the father's legal status was merely that of an "alleged father." Thus, in the father's view, "the only timely, legitimate statutory cause of action [the Department] had against [the father] was a suit to establish his paternity under Chapter 160 of the Texas Family Code." *See* Tex. Fam. Code § 160.201(b). Moreover, the father contends that because he was an alleged father, a termination suit could have been brought against him only under the authority of Section 161.002 of the Texas Family Code, which sets out the exclusive grounds for termination of the rights of an "alleged father." *See id*. § 161.002. According to the father, because of various timing and citation requirements contained within Section 161.002, he could not have committed any of those statutory grounds for termination at the time the Department's suit was filed. *See id*. § 161.002(b)(1) (providing for termination if, "after being served with citation, [the alleged father] does not respond by timely filing an admission of paternity or a counterclaim for

3

paternity under Chapter 160"), (2) (providing for termination if, among other requirements, "the child is over one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed"), (3) (providing for termination if "the child is under one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed and he has not," within 31 days following the child's birth, "registered with the paternity registry under Chapter 160"), (4) (providing for termination if alleged father "has registered with the paternity registry under Chapter 160, but the petitioner's attempt to personally serve citation at the address provided to the registry and at any other address for the alleged father known by the petitioner has been unsuccessful, despite the due diligence of the petitioner").

However, this was more than a suit to terminate parental rights. This was a suit by the Department for the protection of a child brought under Chapter 262 of the Texas Family Code. *See id*. §§ 262.001–.353. Multiple issues were to be determined in the case, including termination, paternity, and conservatorship. It is undisputed that when the suit began and the father was merely an "alleged father," the father believed himself to be the child's biological father and intended to care for the child.[1] At the same time, the Department was seeking temporary custody of the child, determination of paternity, and, if the father was determined to be the biological father of the child, termination of the father's parental rights. Thus, in filing the suit, the Department was not asking the court to decide hypothetical or "abstract questions of law without binding the parties." *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). Instead, the Department was asking the court to decide a "real controversy between the parties" that would be "actually resolved by the judicial relief sought." *See Save*

---

[1] In fact, in his brief, the father acknowledges that he was "present at the birth of the child" and considered himself to be "ready, willing and able to assume his role as the parent of the child."

4

*Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 683 (Tex. App.—Austin 2004, no pet.). Moreover, the suit was brought regarding not only the child's father, but also the child's mother. In the affidavit attached to its petition, the Department alleged that the child had tested positive for methamphetamines at birth. Therefore, when the Department's suit was filed, the "threat of harm" to the child was "more than conjectural, hypothetical, or remote." *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 78 (Tex. 2015). The harm to the child had already occurred—the child had been exposed to methamphetamines *in utero*.

To the extent that the father is arguing that he could not have been responsible for that or any other injury to the child due to his being an "alleged father" and therefore not a proper party to the termination suit, or that the Department should have filed its claim for termination of the father's parental rights in a separate lawsuit, after his identity as the child's biological father had been established, the father is conflating the doctrines of ripeness and joinder. Ripeness focuses on whether an injury alleged in a lawsuit "has occurred or is likely to occur," *see Patterson*, 971 S.W.2d at 442, whereas joinder focuses on whether the lawsuit includes the proper parties and / or claims, *see Attorney Gen. of Tex. v. Lavan*, 833 S.W.2d 952, 954 (Tex. 1992); *Cooper v. Texas Gulf Indus., Inc.*, 513 S.W.2d 200, 204 (Tex. 1974); *In re D.L.B.*, 943 S.W.2d 175, 180 (Tex. App—San Antonio 1997, no writ). The father's arguments—which concern whether he, as an alleged father, should have been joined as a party to the action and, if so, whether the Department's claim for termination of the father's parental rights should have been joined to its claim to adjudicate parentage—implicate joinder.

Complaints regarding joinder are not jurisdictional in nature and must be raised prior to trial or they are waived. *See, e.g.*, *In re J.W.M.*, 153 S.W.3d 541, 546 (Tex. App.—Amarillo 2004, pet. denied); *Rosales v. H. E. Butt Grocery Co.*, 905 S.W.2d 745, 751 (Tex.

5

App.—San Antonio 1995, writ denied); *University of Tex. at Austin v. Hinton*, 822 S.W.2d 197, 200 (Tex. App.—Austin 1991, no writ); *see also* Tex. R. Civ. P. 41 ("Misjoinder of parties is not ground for dismissal of an action."); *Houston N. S. R. Co. v. Tyrrell*, 98 S.W.2d 786, 796 (Tex. 1936) ("If there were misjoinder, it would not deprive the trial court of jurisdiction and would not warrant dismissal of the entire proceeding. The question is properly raised by special exception or by plea in abatement; and the improper joinder of parties is not a ground for dismissal of the suit as to those properly joined."); *Scarbrough v. Purser*, No. 03-13-00025-CV, 2016 Tex. App. LEXIS 13863, at \*64–65 (Tex. App.—Austin Dec. 30, 2016, pet. denied) (mem. op.) ("[M]isjoinder of actions is a procedural, not jurisdictional matter."). Because the father failed to raise his complaints until after the trial had concluded, they are waived. *See* Tex. R. App. P. 33.1(a). Moreover, even if the father's arguments had been preserved, the Texas Family Code and the Texas Rules of Civil Procedure contain broad joinder provisions. *See, e.g.*, Tex. Fam. Code §§ 102.001(b) ("One or more matters covered by this title may be determined in the suit [affecting the parent-child relationship]."); 160.603(2) (providing that "a man whose paternity of the child is to be adjudicated" "must be joined as [a party] in a proceeding to adjudicate parentage"); 160.610(a) ("[A] proceeding to adjudicate parentage may be joined with a proceeding for adoption, termination of parental rights, possession of or access to a child, child support, divorce, annulment, or probate or administration of an estate or another appropriate proceeding."); Tex. R. Civ. P. 39(a) ("A person who is subject to service of process shall be joined as a party in the action if . . . he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may . . . as a practical matter impair or impede his ability to protect that interest."), 40(a) (providing for permissive joinder of defendants "if there is asserted against them jointly, severally, or in the alternative any right to

relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action"), 51 (providing for joinder of claims and remedies), 174(a) ("When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions."). We cannot conclude that the district court abused its discretion in joining the parties and claims in this case pursuant to those provisions.

We overrule the father's first and second issues.

## Evidentiary sufficiency

In his third issue, the father argues that the evidence is legally and factually insufficient to justify terminating his parental rights. A trial court may order termination of the parent-child relationship if the Department proves by clear and convincing evidence that (1) the parent has committed one of several statutory grounds for termination and (2) termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). The father contends that the evidence is legally and factually insufficient to prove either requirement.

### *Standard of review*

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). "Involuntary severance of parental rights thus requires 'clear and convincing evidence' that termination is warranted and in the child's best interest." *Id*. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that

7

relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id*. at 630 (quoting Tex. Fam. Code § 101.007; *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631.

"Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

### *Statutory grounds for termination*

The Department alleged and the district court found that the father had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or

knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (3) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). "[C]lear and convincing proof of any one ground will support a judgment terminating parental rights, if similar proof also exists that termination is in the child's best interest." *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Therefore, when multiple statutory grounds for termination are found to have been committed, we must uphold the judgment if there is sufficient evidence of any one of those grounds. *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.) (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)).[2]

In this case, we conclude that there is legally and factually sufficient evidence to support a finding that the father "engaged in conduct or knowingly placed the child with persons

---

[2] We note that the Texas Supreme Court has recently held that when a trial court bases its decision to terminate parental rights on the statutory grounds specified in section 161.001(b)(1)(D) or (E) of the Family Code, the appellate court is required to ensure that the evidence is sufficient to support at least one of those grounds. *In re N.G.*, No. 18-0508, 2019 Tex. LEXIS 465, at *13 (Tex. May 17, 2019). This is because a finding under either (D) or (E) could be used in future proceedings to terminate a parent's rights to other children. *See* Tex. Fam. Code § 161.001(b)(1)(M) ("The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)."); *N.G.*, 2019 Tex. LEXIS 465 at *14 n.1 ("We recognize that this holding may mean that appellate courts will review findings under section 161.001(b)(1)(D) or (E) without reviewing other grounds. Because those other grounds carry no weight for parental rights to other children under section 161.001(b)(1)(M), due process demands no more."); *see also In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 Tex. App. LEXIS 3956 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.) (concluding that because evidence was sufficient to support trial court's finding under subsection (E), appellate court did not need to review sufficiency of evidence to support finding under subsection (D)).

who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). Subsection (E) requires proof of child endangerment, i.e., exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct. *Id*. "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533); *see also In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). "Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act." *Asjes v. Texas Dep't of Protective & Regulatory Servs.*, 142 S.W.3d 363, 370 (Tex. App.—El Paso 2004, no pet.) (citing *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ)). "The conduct to be examined includes what the parents did both before and after the child was born." *Id*. (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *Dupree*, 907 S.W.2d at 84).

A parent's illegal drug use may constitute endangerment under subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support

10

termination under [subsection (E)].") (internal quotation marks omitted); *T.M. v. Texas Dep't of Family & Protective Servs.*, No. 03-14-00784-CV, 2015 Tex. App. LEXIS 5150, at \*6 (Tex. App.—Austin May 21, 2015, no pet.) (mem. op.) ("It is well-established that a parent's illegal drug use may constitute endangerment."); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."); *Vasquez v. Texas Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (concluding that evidence was factually sufficient to support finding of endangerment even though there was no direct evidence that parent's drug use injured child). Further, "[c]onduct that subjects a child to [a] life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.) ("The endangerment to the child's well-being may be inferred from parental misconduct, including conduct that subjects the child to a life of uncertainty and instability."). Therefore, "[e]vidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct." *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.).

In this case, the father testified that he was arrested for delivery of a controlled substance, methamphetamine, on February 7, 2018, while the case was ongoing. According to the father, that charge was still pending. Kristen Laskiewicz, the Department caseworker assigned to the case, testified that when she had visited the father in jail following his arrest, he explained to her that police had found "a pipe and a small bag of meth on him," but he claimed

11

that the methamphetamine did not belong to him and instead belonged to the mother. However, the father acknowledged in his testimony that both he and the mother had used methamphetamines in February 2018 while they were living together in the mother's apartment. Moreover, contrary to the father's assertion on appeal, his methamphetamine use did not appear to be an "isolated incident." The father testified that when the child was born, he was already on probation for possession of methamphetamine. Additionally, according to Laskiewicz, when she had visited the father and the mother in March 2018, the mother claimed that they were continuing to use methamphetamine, although the father denied that he was "under the influence" at that time and was instead "coming down" from prior methamphetamine use.

In summary, the Department presented evidence that the father had: (1) used methamphetamine in the past; (2) was currently on probation for using methamphetamine; (3) had used methamphetamine while the case was ongoing and while he was still on probation for prior methamphetamine use; and (4) had been arrested for delivery of methamphetamine and that those charges were still pending. Viewing the evidence in the light most favorable to the district court's finding, we conclude that the evidence is legally sufficient for the district court to have formed a firm belief or conviction that the father engaged in conduct that endangered the physical or emotional well-being of the child. Moreover, the father presented no contrary evidence tending to show that he had not used methamphetamine both before the child was born and while the case was ongoing. Accordingly, when considering the Department's evidence in light of the entire record, the evidence is also factually sufficient to support the district court's finding that the father had endangered the child. *See J.OA.*, 283 S.W.3d at 345 (explaining that because endangering conduct "is not limited to actions directed towards the child," it "may include the parent's actions before the child's birth . . . including evidence of drug usage"); *M.C.*,

12

482 S.W.3d at 686 (concluding that parent's continued use of illegal drugs provided legally and factually sufficient evidence that parent endangered children's well-being); *In re S.M.L.D.*, 150 S.W.3d 754, 758–59 (Tex. App.—Amarillo 2004, no pet.) (concluding that evidence was legally and factually sufficient to prove endangerment when parents used cocaine prior to child's birth and continued to use cocaine following child's birth).

### *Best interest of the child*

"The second termination prong—best interest—is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. "A best-interest determination is thus guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (7) any excuse for the parent's acts or omissions." *Id*. (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see also* Tex. Fam. Code § 236.307(b) (listing additional best-interest factors that are probative in "determining whether the child's parents are willing and able to provide the child with a safe environment"). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest," *C.H.*, 89 S.W.3d at 27, but the best-interest finding "must be supported by clear and convincing evidence in the record," *E.N.C.*, 384 S.W.3d at 808.

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent" and in "maintaining the parent-child relationship," *In re R.R.*,

209 S.W.3d 112, 116 (Tex. 2006); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980), and the Department carries the burden of proof to overcome that presumption with "clear and convincing evidence," *G.M.*, 596 S.W.2d at 847; *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). This "heightened" burden of proof at trial results in a "correspondingly searching standard of appellate review." *A.C.*, 560 S.W.3d at 630. "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *C.H.*, 89 S.W.3d at 25. With these considerations in mind, we turn to the evidence presented in this case.

### The child's emotional and physical needs

The child was approximately eleven months old at the time of trial. There is no evidence in the record indicating that the child has any special needs. Laskiewicz testified that the child has "the basic needs" of an infant, including to "eat regularly," be on a schedule, and "be nurtured." Laskiewicz also agreed with the Department's characterization of the child as an "active child" who is in need of "constant supervision" because she is now crawling.

Laskiewicz did not believe that either the father or the grandmother, who had been identified by the father as a possible caregiver for the child, were capable of meeting the child's basic needs. She based her belief on her observations of the father and the grandmother during their visits with the child. Laskiewicz testified that the grandmother "did not bring basic need items" for the child during her visits, such as diapers, wipes, and food. According to Laskiewicz, the failure to bring those items demonstrated to the Department "that she's not putting that extra effort that she is wanting to care for [the child]." Laskiewicz also testified that she did not believe that the grandmother would put the child's needs ahead of the father's needs.

14

As for the father's visits, Laskiewicz testified that the father had visited the child a "handful" of times when she was placed with relatives but that he would be late for the visits or "fall asleep on the couch" during the visits. Laskiewicz also testified that between March and June 2018, the father made none of his scheduled visits with the child and that between June and September 2018, the father made only three visits. When asked why she believed that it was in the child's best interest for the father's parental rights to be terminated, Laskiewicz testified, "He has not shown that he can provide stability for [the child]. He has not shown that he has grown a bond with [the child], as he has not made visits. He has not shown that he can properly provide for [the child], just providing the basic need items that she needs."

**The emotional and physical danger to the child now and in the future**

As discussed above, there is evidence tending to show that the father had used methamphetamine in February 2018 and possibly in early March 2018, but there is no evidence that the father was currently using methamphetamine or any other drugs. In fact, when Laskiewicz was asked if the father had "been testing negative" for methamphetamine "over the last few months," she answered that he had.

There is also no evidence that the father is currently associating with other drug users, including the child's mother. The father testified that when he moved to Stanton, where he currently lives, he did not stay in touch with the mother or her friends who had been using drugs with them. He explained, "Since I left San Angelo, I stopped using, because when I was here, I hung around with the wrong people and the wrong crowd, and they say if you hang out with the wrong crowd you become that crowd, but if you leave that crowd, you become something better in life."

15

Other than the father's prior methamphetamine use, the only other evidence tending to show that the father might pose a danger to the child is a Facebook post by the father from May 2018, in which the father mentioned "giving up" and "disappearing from the world."[3] The Department interpreted this post as a suicide threat. However, the father denied that he had wanted to end his life. Instead, he claimed that he meant that he "wanted to stay away from the world for a while and stay out of trouble, not hurt myself." In response to this post, the Department had initiated a wellness check on the father. According to the father, when the police arrived "to see if everything was okay," "[he] was doing okay." Laskiewicz testified that since that time, the father had not made any similar posts on Facebook.

**The parental abilities of the individuals seeking custody and the plans for the child by those individuals and the stability of the home**

The father testified that he currently lives in Stanton, Texas, in a trailer home that was given to him by his mother. The father explained that although he does not pay rent for the trailer, he pays a fee of approximately $500 per month for the lot on which the home is located. The father also testified that he pays his water bill, electric bill, cable bill, and phone bill, in addition to paying his probation fees of approximately $500 per month. The father claimed that his probation would be completed in approximately four months, after he had paid his remaining probation fees. The father also explained that child support for the child is taken out of his paycheck in the amount of $135.00 every two weeks.

The father testified that he works as a field technician for an oil company and that he earns between $990 and $1300 every two weeks, depending on the number of hours that he works. According to the father, he works Monday through Friday and usually goes to work at

_____

[3] The Facebook post itself was not admitted into evidence. Thus, the record does not reflect exactly what the father wrote.

16

6:30 a.m. and leaves work at 5:00 p.m. The father began his employment at the oil company in September 2018. Prior to that, the father worked at a Chick-fil-A for three months, and he acknowledged that before he began working at Chick-fil-A, when he was living in San Angelo, he was unemployed.

The child is the father's first child. As part of his service plan with the Department, the father was required to complete parenting classes. However, he acknowledged that he "only did about three or four classes" and did not obtain a certificate of completion. When asked why he had not visited the child more often, the father explained that it was difficult to schedule visits "when you work in the oil field and get called out to rigs" in other cities. Similarly, the father claimed that when he worked for Chick-fil-A, it was difficult to visit the child because "they were so shorthanded, they always called me in for work." The Department then asked the father if he "chose to go to work versus go visit [his] daughter." The father answered, "I chose to go to work instead of visit my daughter because I wanted to make more money" and "wanted [the child] to have a better life than I ever could give." He added, "I want her to have a better life than me, and I want to work for her and sweat blood and tears for my daughter." The father also testified that when he was unemployed and living in San Angelo, he had difficulty visiting the child in Stanton because he did not have a car and, when his mother was working, he "wouldn't have a ride to go see my daughter." The father also claimed that he had been denied visitation on at least one occasion when he had arrived late, although Laskiewicz denied this.

The father testified that he did not want his parental rights terminated and that he was "asking for [the child] to come home and live with my mom until I get back on my feet." When asked how long it would take him to "get on [his] feet," the father testified, "It won't take

17

me that long. Right now—I'm just remodeling my house right now. So, it will probably take me about—let's say about three months." When asked to describe his remodel of the trailer, the father explained that he was "putting a new floor in the trailer house" to make it safe for the child to be inside the trailer. When asked why he believed that the child should live with his mother while he was renovating the trailer, he explained, "Because my mom, she's been around kids. She's been around my niece and nephew. She's a good person. She knows a lot about kids. She's got integrity, loyalty, respect, and she's got honesty."

The grandmother also testified at the hearing. The grandmother explained that she and her husband own the trailer in which the father currently resides. When asked if the father paid them rent to live in the trailer, the grandmother explained, "He was paying in the beginning because we wanted to see that he was responsible; but here recently, about a month ago, we told him not to pay no more, and we gave it to him because we can see that he's gotten more responsible and he's fixing it." The grandmother also expressed her belief that the father had become more stable and responsible since moving back home. When asked why she believed this, she explained, "Because he's working on his house. He's staying with this job, and he's on time at work, because—and the way he's acting now, and he's dressing up more, things that I've noticed [are] better for him. It's like his self-esteem has gotten stronger."

The grandmother testified that she lives in Stanton with her husband, her daughter, and her daughter's two children, a four-year-old girl and a three-year-old boy. They live in a four-bedroom, two-bathroom house, with one of the bedrooms having been made into a baby room for the child. When asked to explain why she had not visited the child earlier in the case, the grandmother claimed that Laskiewicz had discouraged her from visiting the child because Laskiewicz believed that the father was "the one that needed to be on top of this," not

18

the grandmother. However, the grandmother had visited the child later in the case, in September and October 2018.

The grandmother further testified that she believed that she could provide a safe home for the child. She explained that she had raised babies before and that she has young children in her home right now who are first cousins to the child. When asked why she believed that it would be in the child's best interest to be placed in her home, the grandmother testified, "Because she would have the love and support of a family." When asked what would happen "if it came down to [her] having to protect [the child] or having to favor [the father]," the grandmother testified, "[the child] would come first" and that this would include sending the father away to rehabilitation so that he could "get some help away from the family."

**The plans for the child by the agency seeking custody and the stability of the proposed placement**

The record reflects that the child had been placed in multiple homes while the case was ongoing. Laskiewicz testified that the child first came into the Department's care on December 12, 2017, and she was originally placed with a maternal aunt. Following the adversary hearing on December 21, 2017, the child was placed with the mother and the father on a "monitored return" until March 6, 2018, when the district court revoked the placement following the father's arrest. Laskiewicz testified that the child is currently residing at a foster placement in San Angelo. According to Laskiewicz, the child had been in that placement on two separate occasions, from April 17 until June 4, 2018, and from September 17, 2018, to the present. She explained that the child had been removed from that placement in June 2018 because the Department had found "parental relatives" of the father, the grandmother's brother and his wife, who had wanted to care for the child. However, in September 2018, the wife called

Laskiewicz and informed her that she and her husband were getting a divorce and that "financially she could not care for [the child] anymore." At that time, the child was returned to the foster placement.

Laskiewicz further testified that the Department was currently looking to place the child with relatives but that if no suitable relative could be found, the Department's permanency plan was non-relative adoption. According to Laskiewicz, the current foster caregivers, identified as D.H. and S.H., "would be willing to adopt" the child. That was the extent of the Department's evidence regarding the proposed placement. No evidence was presented as to the conditions of the proposed placement or the parental qualifications of the proposed caregivers.

### The parent's acts or omissions that may indicate the existing parent-child relationship is improper and any excuse for the parent's acts or omissions

"Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *A.C.*, 560 S.W. at 631–32 (citing *C.H.*, 89 S.W.3d at 28). As we have already explained, the father had used methamphetamine on prior occasions, but there was no evidence that he was currently using methamphetamine and, according to Laskiewicz, his most recent drug tests were negative. Additionally, the father testified that he was no longer associating with the individuals with whom he had been using methamphetamine, and the Department provided no contrary evidence on this point.

Laskiewicz testified that the father had also failed to comply substantially with the terms of the Department's service plan by failing to complete his parenting classes and to visit regularly the child. However, as discussed above, there was some evidence tending to show that

these failures could be explained, at least in part, by the father's lack of transportation when he was living in San Angelo and his employment once he moved to Stanton.

Finally, the attorney ad litem for the child recommended that termination of the father's parental rights was in the best interest of the child. He reiterated that the foster parents have "expressed an interest in adopting her," and he emphasized that the child has spent more time with them than she has spent elsewhere.

### Conclusions regarding sufficiency

In summary, the Department presented evidence that the father had used methamphetamine both before and after the child's birth, that he had been arrested for a methamphetamine offense while the case was ongoing, and that he faced an uncertain future, including the possibility of imprisonment, because that charge remained pending. Additionally, the father had failed to visit regularly the child and failed to complete his parenting classes as required by the Department. Some evidence was presented that the father might have contemplated suicide at one point during the case. Moreover, the father's proposed immediate placement for the child, the grandmother, did not visit the child until later in the case, was late to those visits, and, according to Laskiewicz, failed to bring "basic need items" for the child during her visits. Meanwhile, the Department's plan for the child was placement with relatives or, if no suitable relative could be found, placement with foster parents who had previously cared for the child on two separate occasions and who were "willing to adopt" the child. Viewing this evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that termination of the father's parental rights is in the best interest of the child.

We reach the same conclusion regarding the factual sufficiency of the evidence. Although there is some evidence that termination of the father's parental rights may not be in the best interest of the child, we are unable to conclude that it is "so significant that the factfinder could not have formed a firm belief or conviction" that termination was appropriate here. A factfinder is entitled to give "great weight" to a parent's drug-related conduct, as it is considered a "significant factor" supporting termination. *See In re E.R.W.*, 528 S.W.3d 251, 266–67 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re K.C.*, 219 S.W.3d 924, 927–29 (Tex. App.—Dallas 2007, no pet.); *Dupree*, 907 S.W.2d at 86–87; *see also E.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00427-CV, 2018 Tex. App. LEXIS 9423, at *8–11 (Tex. App.—Austin Nov. 20, 2018, no pet.). Here, there was undisputed evidence that the father had used methamphetamine while the case was ongoing and while he had access to the child during the monitored-return period. Even though the father might have stopped using methamphetamine later in the case, the district court could have reasonably inferred that the father's past conduct could recur in the future if the child were to be returned to the father. *See In re A.R.O.*, 556 S.W.3d 903, 912 (Tex. App.—El Paso 2018, no pet.). The district court also could have inferred that the positive changes that the father had made in the "few months" prior to trial occurred too late in the case to demonstrate that the father could provide the child with the long-term safety and stability that the child would need over the course of her childhood. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The record also includes evidence tending to show that: (1) the father did not comply with the terms of his service plan and failed to complete his parenting classes; (2) when the child was initially placed with a maternal aunt, the father visited the child a "handful" of

22

times but "did not engage or interact with the child" during those visits; (3) from March to June 2018, the father failed to visit the child on any occasion, despite the caseworker attempting to arrange visits around the father's work schedule; and (4) from June to September 2018, when the child was placed with the father's relatives, the father visited the child on only three occasions, despite living in the same town where the child lived. Based on the father's failure to complete his parenting classes and his failure to visit the child on a consistent, regular basis, the district court could have reasonably inferred that the father, despite his claims to the contrary, was not ready, willing, or able to be a parent to the child. *See In re S.N.*, 287 S.W.3d 183, 193 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (concluding that father's inconsistent and missed visits and failure to complete parenting classes supported trial court's best-interest determination).

Additionally, the Department's primary plan for the child was placement with relatives. Thus, the evidence summarized above tending to show that the grandmother might be a suitable placement for the child, including that she has a "stable home," prior experience raising children, and the ability to financially support the child, could be used in future proceedings to determine the child's permanent placement.[4]

We also observe that if the Department's plans for relative placement do not come to fruition, the Department presented evidence that it already has foster parents available who are willing to adopt the child and who had previously cared for the child on two separate occasions for approximately four months, which was significantly more time than the father had spent with the child. Further, the Department's lack of evidence as to definitive plans for permanent

---

[4] Although Laskiewicz testified that the Department "would not plan" to place the child with the grandmother, she also suggested that if the grandmother addressed the issues raised in the home study, she could speak with her supervisor "to see if we could do another home study."

placement and adoption is not dispositive of the best-interest inquiry. *See C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.* In light of the entire record in this case, we conclude that a factfinder could reasonably form such a belief. Accordingly, the evidence is factually sufficient to support the district court's best-interest determination.

We overrule the father's third issue.

**Ineffective assistance of counsel**

In his fourth issue, the father asserts that he received ineffective assistance of counsel during trial. Specifically, he claims that counsel was ineffective by: (1) failing to demand a "trial de novo"; (2) permitting the father to testify to matters relating to his pending criminal case; (3) failing to conduct discovery or challenge the admissibility of Department evidence prior to trial; (4) failing to seek dismissal of the suit on jurisdictional grounds prior to trial; (5) failing to seek a bifurcated trial separate from the mother's trial; and (6) failing to adequately prepare the father for trial.

The statutory right to counsel in parental-rights termination cases includes, as a matter of due process, the right to effective counsel. *C.S.F. v. Texas Dep't of Family & Protective Servs.*, 505 S.W.3d 618, 619 (Tex. 2016) (citing *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003)). The Texas Supreme Court has held that in termination cases, "the appropriate standard for determining whether counsel is effective should be the same as the standard applied in criminal cases." *M.S.*, 115 S.W.3d at 544. Accordingly, we are to apply the familiar two-pronged standard set forth by the United States Supreme Court in *Strickland v. Washington*:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. 668, 687 (1984). "Thus, an ineffective assistance of counsel claim requires a showing of a deficient performance by counsel so serious as to deny the defendant a fair and reliable trial." *In re J.O.A.*, 283 S.W.3d 336, 342 (Tex. 2009). The parent has the burden to prove by a preponderance of the evidence that counsel was ineffective. *In re P.M.W.*, 559 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, pet. denied).

"With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *M.S.*, 115 S.W.3d at 545. "[C]ounsel's performance falls below acceptable levels of performance when the 'representation is so grossly deficient as to render proceedings fundamentally unfair . . . .'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim App. 1983)). "In this process, we must give great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999)). "Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." *In re S.L.*, 188 S.W.3d

388, 395 (Tex. App.—Dallas 2006, no pet.) (citing *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002)). "Thus, when the record is silent regarding counsel's reasons for his conduct," as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *Id.* (citing *Ortiz v. State*, 93 S.W.3d 79, 88-89 (Tex. Crim. App. 2002)). Stated another way, if counsel "may have acted in accordance with a plausible strategy," we will not find counsel's conduct deficient. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Here, none of counsel's challenged actions rise to the level of ineffective assistance. Counsel was under no obligation to request a de novo hearing and could have strategically decided that he would have a better chance of challenging the sufficiency of the evidence on appeal if the Department was not given another opportunity, at a de novo hearing, to strengthen its case for termination with additional evidence. Counsel also could have decided, as a matter of strategy, that the father had a better chance of retaining his parental rights if, instead of invoking his Fifth Amendment privilege not to testify as to matters concerning his pending criminal case (which would risk the district court drawing an adverse inference from the invocation), he accepted responsibility for his arrest and explained how his conduct had improved in the months following his arrest. Moreover, even if counsel had sought to "bifurcate" the case (which he was under no obligation to do), the rules for joinder of parties and claims in suits affecting the parent-child relationship are expansive, as previously discussed, and the father has failed to demonstrate that there is a reasonable probability that the district court would have agreed to bifurcate the proceedings upon request. Counsel further could have made a strategic choice not to seek bifurcation of the mother's trial because evidence of the mother's

26

conduct and drug use was important to his case—it tended to show that the father had been negatively influenced by the mother in the past and that he was now free from that influence.

We also cannot conclude that counsel was deficient by failing to file a pretrial plea to the jurisdiction or a pretrial motion to exclude the Department's evidence. As we earlier explained, the district court had jurisdiction here and therefore any plea to the jurisdiction filed prior to trial would have been denied. Similarly, the father has failed to demonstrate that the Department's evidence was inadmissible and that the district court would have abused its discretion in refusing to exclude it. Counsel cannot be deficient for failing to file futile motions that the district court would have denied or that would not have changed the outcome of the proceeding. *See In re A.L.W.*, 2015 Tex. App. LEXIS 7220, at *43–44 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (mem. op.) (citing *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991)); *see also Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007, no pet.) (explaining that to demonstrate ineffectiveness from counsel's failure to file pretrial motion to exclude evidence, appellant must prove that motion "would have been granted and that the remaining evidence would have been insufficient" to support judgment). The father has also failed to demonstrate that he was prejudiced by any failure of counsel to conduct formal discovery in this case or that counsel had failed to adequately prepare the father to testify. *See In re K.S.*, 420 S.W.3d 852, 856–57 (Tex. App.—Texarkana 2014, no pet.) (rejecting contention that counsel was ineffective for failing to request written discovery when there was "no evidence that such written discovery would have produced any fruits or that there was a necessity for it" and that record reflected that "counsel was familiar with all the individuals involved and had a strong understanding of the situation and the parties involved"); *see also Lynch v. State*, No. 08-15-00180-CR, 2018 Tex. App. LEXIS 4884, at *13 (Tex. App.—El Paso June 29, 2018, no pet.)

27

(op.) (rejecting claim that testimony of appellant and his mother demonstrated counsel's "failure to adequately prepare the witnesses" and concluding that "imperfect answers of witnesses do not affirmatively demonstrate ineffective assistance"); *Romero v. State*, 2008 Tex. App. LEXIS 9376, at *17–18 (Tex. App.—Houston [14th Dist.] Dec. 18, 2008, no pet.) (mem. op.) (concluding that "[w]ithout a record to show the extent of counsel's preparation" of appellant to testify, court could not conclude that "counsel's conduct was so outrageous that no competent attorney would have engaged in it"). On this record, we cannot conclude that the father proved by a preponderance of the evidence that he received ineffective assistance of counsel.

We overrule the father's fourth issue.

**Constitutional violations**

In his fifth, sixth, seventh, and eighth issues, the father asserts that the termination proceedings violated his constitutional rights in various ways. In his fifth issue, the father claims that he was "compelled to be a witness against himself." In his sixth issue, the father asserts that involuntary termination of his parental rights amounted to "cruel and unusual punishment." In his seventh issue, the father contends that the statutes that provide for termination of parental rights are facially unconstitutional. In his eighth issue, the father claims that the termination statutes are unconstitutional as applied to him. However, the father failed to raise any of these contentions in the court below, either before or during trial or in his motion for new trial. Accordingly, these complaints have been waived. *See* Tex. R. App. P. 33.1(a); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) ("[T]he rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error."); *In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003) (observing that in parental-termination cases, "adhering to our preservation rules isn't a mere technical nicety; the interests

at stake are too important to relax rules that serve a critical purpose"); *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) ("In termination cases, judicial economy is not just a policy—it is a statutory mandate. . . . Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution."); *Texas Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (refusing to consider merits of constitutional claims that were not asserted in court below). Moreover, even if these issues had been preserved in the court below, the father has failed to address adequately the merits of the alleged constitutional violations in his brief on appeal. *See* Tex. R. App. P. 38.1(i).

We overrule the father's fifth, sixth, seventh, and eighth issues.

## CONCLUSION

We affirm the district court's termination order.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed: June 6, 2019