# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00142-CV

### S. R., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 22ND DISTRICT COURT OF COMAL COUNTY
### NO. C2019-1628A, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

S.R. (Mother) appeals from the trial court's final order terminating her parental rights to her daughter C.R., who was born in May 2016.[1] The trial court found that Mother had engaged in conduct or knowingly placed C.R. with other people who engaged in conduct that endangered the child's well-being, had failed to comply with a court order that established actions necessary for Mother to regain custody, and had used a controlled substance in a manner that endangered C.R. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O), (P). On appeal, S.R. complains only of the trial court's finding against her on the (E) grounds—endangerment—and asks that we either remand for a new trial or render judgment deleting that ground from the termination order. We affirm the trial court's order.

---

[1] For the child's privacy, we refer to her by her initials and to her family members by their relationships to her. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father's rights were also terminated, but he is not a party to this appeal.

## STANDARD OF REVIEW

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. *Id.* § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to the finding but otherwise assume the factfinder resolved disputed facts in favor of its finding. *A.C.*, 560 S.W.3d at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against the evidence favoring the finding and ask whether a reasonable factfinder could not have weighed the evidence in favor of the finding. *Id.*

Subsection (E) allows for termination of the parent-child relationship if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *see In re M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied) (endangerment must be direct result of parent's course of conduct but conduct does not have to be "specifically directed" at child, cause actual injury

2

to child, or "even constitute a concrete threat of injury to the child"). In considering whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child, *see V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.), we may consider the parent's actions and her omissions or failures to act, *M.J.M.L.*, 31 S.W.3d at 350–51. Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers a child's well-being, *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (evidence of parent's drug use or that parent allowed child to be around drug user can qualify as "voluntary, deliberate, and conscious course of conduct" that endangers child); *M.E.-M.N.*, 342 S.W.3d at 263 ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."). Further, a parent's decision to use illegal drugs while a termination suit is pending, and the parent is thus at risk of losing her child, may support a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *C.V.L.*, 591 S.W.3d at 751; *M.E.-M.N.*, 342 S.W.3d at 263.

## SUMMARY OF THE EVIDENCE

Department investigator Vanessa Campanella testified that on July 8, 2019, the Department received a referral of neglectful supervision after Father tested positive for marijuana

and methamphetamine following a car accident; C.R. was in the car but uninjured.[2]  Campanella started her investigation about two weeks later, when she received Mother's drug-test results, which were positive for methamphetamines and amphetamines.  C.R. remained in Mother's care after the accident, and Mother was to supervise Father when he was with C.R., but when Mother tested positive, Campanella informed the parents that C.R. would be placed with her paternal grandmother (Grandmother).  Campanella worked with the family for about a month and testified that both parents "admitted to the drug use and said they wanted help."

Department caseworker Cindy Doyle was assigned to the family in August 2019.  She testified that Mother completed an in-patient drug rehabilitation program in February 2020 but did not follow through with the required out-patient treatment afterwards.  In addition, Mother missed requested drug tests on March 23, April 2, April 17, and May 22; tested negative on May 7; tested positive for amphetamines and methamphetamines on June 5; tested negative in all the Department's requested drug tests from September through November; missed "a couple" tests in December; missed three tests between January and March 2021; and tested negative on March 4.  By the final hearing, Mother had just re-engaged in out-patient drug treatment and had attended several group sessions.  Mother never provided Doyle with any proof that she had attended AA or NA meetings.

Doyle testified that Mother attended several individual counseling sessions in late 2020 and then missed several sessions and said she wanted to switch counselors.  Although Doyle sent Mother's paperwork to the new provider, Mother did not start with the new therapist until two or three weeks before the final hearing.  Doyle testified that Mother had not maintained

---

[2] The final hearing was held February 25 and March 18, 2021, via video conference pursuant to the Supreme Court of Texas's Second Emergency Order Regarding the COVID-19 State of Disaster (Misc. Docket No. 20-9043) and all subsequent Orders.

stable housing because although Mother had found "a place to stay" by living with a friend, she "did not have a place of her own." Further, Mother had moved out in late October 2020 without informing Doyle of her change in address. Doyle's communication with Mother was "[v]ery sporadic," and Mother frequently failed to respond to Doyle's attempts to contact her.

Mother was allowed unlimited video and phone calls with C.R. from March 2020 until October 2020. However, Doyle said Mother's contact with C.R. "wasn't frequent and it would occasionally be several weeks" between calls. In October 2020, the Department set up a regular weekly videocall visitation schedule, but Mother "just didn't call" eight or nine times. She then started to attend about every other visit and had been "fairly regular" for the last "four weeks or so." Doyle also testified that in late September 2020, the parties entered into a Rule 11 agreement to give the parents additional time to complete services. The agreement provided that if the parents "are a couple, they would be treated as one unit," meaning that they "would both complete and show their diligence in their efforts." Doyle had concerns about whether Mother would "be able to provide a safe and stable home" for C.R. and "remain drug free." Doyle was also concerned about the parents' "extremely unstable and occasionally volatile" relationship and said that "the back and forth between the two of them, that was a huge concern." The parents never attended couple counseling, despite the Department's efforts to arrange it.

Caseworker Jennifer Hall worked with the family between June and August 2020, while Doyle was on medical leave. She testified that she tried unsuccessfully to meet with the parents but that she was able to make phone contact with them and conduct one "family group conference." Hall asked each parent three times to take a drug test—Mother took one test, which was positive for marijuana, and Father did not take any. Hall testified that the Department tried to set up individual counseling, but that Mother did not contact the counselor for several weeks

and then missed the appointment once it was scheduled. Finally, Hall said Mother underwent a psychological evaluation but "was very short answered and declined to elaborate on her answers," resulting in the psychologist being unable to make any recommendations.

Deputy Billy Bliss of the Comal County Sheriff's Office testified that in early October 2019, he responded to an assault call involving Mother and Father. Mother told Bliss that she wanted to press charges against Father "for strangling her, for choking her," and that Father "has a history of becoming violent with her." Mother reported that she had tried to put a chair between her and Father but that he "smashed the chair and punched the wall," then pushed her against the wall and put his hands "around her neck and began to strangle her," at which point "she lost the ability to breathe." Bliss's report stated that he observed "fresh bruising around her neck." Father was not at the scene, and Bliss did not see any children "around at the time." Detective Eric Guerretaz was assigned to investigate the incident but was never able to contact Mother despite making several attempts; the case was eventually set aside as "inactive due to noncontact." Deputy Shaun Farley testified that in August 2020, he stopped a vehicle driven by Father, in which Mother was the passenger. As he approached the car, Farley smelled "a strong odor of masking spray in the vehicle," explaining that "[p]eople tend to spray it in their vehicle to cover up smells such as narcotics or alcohol." Farley received Father's permission to search the car, found a marijuana pipe in Mother's purse, and issued a citation to Mother for possession of drug paraphernalia. Finally, Deputy Adriana Deleon testified that in November 2020, she responded to a call from Father reporting that his car had been stolen. Mother was also present, and Deleon said that throughout the interview, Mother touched Father "affectionately" and displayed "a real comfortable demeanor with him." Deleon described Mother as Father's "girlfriend" in her report, testifying that she drew that conclusion from the parents' behavior:

6

"It's kind of like when people have been together for a while, you can see they either answer for them, finish their sentences, or when they do something they'll redirect them."

Grandmother testified that Mother and Father had not been regular in their visitations, were not "as engaged with her as they should have been," and sometimes insulted each other in front of the child during visits. Grandmother had asked the parents not to call in the evenings because "when they would call late, it would disrupt [C.R.] too much emotionally," and Grandmother "didn't want her going to bed every night crying." Grandmother explained that C.R. would get upset because the parents "weren't consistent with it. They'll go weeks and—sometimes even over a month and there would be no contact with her." Grandmother had not told C.R. about the weekly call arrangement because early in the proceeding, when C.R. was told about visits only to have her parents fail to attend, she "was very disappointed and sad" and "started getting sick on me, like she would start throwing up." Grandmother also recalled an October 2019 visit, when C.R. dressed up in her Halloween costume only to have her parents not arrive, and testified that it hurts C.R. when her parents are inconsistent in their contact with her.

Grandmother testified that at the time of the hearing, she was no longer in touch with Father and has had "no contact with the mother as well." She did not believe Mother or Father had shown interest in being involved parents or in maintaining their sobriety. Grandmother hoped to adopt C.R. and was not open to being a primary managing conservator and allowing the parents to maintain their rights because:

> [Parents] have been together since 9th grade. And their relationship all these years has been off and on, off and on. Even after [C.R.'s] birth, there has been no stability with them. Being that there are still drug tests that are still positive. And even with the Department and everyone involved, they have not been able to—to do everything that they—that was required of them. I think it wouldn't be fair to [C.R.] or to myself to—to have that chaos constantly in our lives like that.

7

Mother admitted that methamphetamine had been her drug of choice in the past but denied that she "continued to test positive throughout" the proceeding. She insisted that she had missed only one drug test, around Christmas 2020, and said that she would be surprised to hear that she had missed any others and that she was not aware she had tested positive in June 2020 for methamphetamines. Mother admitted that she had relapsed after her in-patient program but said she had since stopped again. She had been attending weekly AA and NA meetings and denied ever using methamphetamines while she was with C.R. Mother admitted that there had been domestic violence between her and Father but said it had happened a "[l]ong time ago." Mother testified that she had been fearful of Father "[a]t the time," and answered, "I don't want to talk about it," when she was asked what he had done. Mother was directed to answer the question and responded, "He choked me." Mother testified that she and Father were no longer in a relationship and that they had broken up while Doyle had been on leave. She denied that she and Father were still in a relationship when they had their interactions with Deputy Farley and Deputy Deleon, saying they sometimes "interact[ed]" and that she was "[b]eing there" for Father when his car was stolen. Father also testified that he and Mother were no longer a couple, saying that was the reason they did not engage in couple therapy, and said they maintained a "cordial" relationship because of their connection through C.R.

## DISCUSSION

Mother argues that the Department did not present "real evidence of a causal nexus between mother's alleged drug use and endangerment of" C.R. and argues that we should not simply "conflate" drug use with child endangerment, but this is not a case in which there was

8

evidence of mild or irregular drug use and nothing else.[3] There was evidence that Mother tested positive for methamphetamine use before and after C.R. was removed, engaged in services only partially (for instance, failing to follow up after her in-patient treatment program and relapsing into drug use), was cited for having drug paraphernalia, continued her "unstable and occasionally volatile" relationship with Father despite at least one instance of domestic violence during the case in which Father "choked" her; and, importantly, did not maintain regular, predictable contact with C.R., causing the child such distress that she became physically ill.

Mother and Father both testified that they had broken up, but the Department's witnesses disputed those assertions, and it was for the trial court to decide which testimony (and reasonable inferences therefrom) was more credible. *See A.C.*, 560 S.W.3d at 630-31. And although Mother seemed to have made strides in sobriety and attempting to re-engage in services shortly before the final hearing, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346; *see In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—

---

[3] Mother cites for that proposition *M.D. v. Texas Department of Family & Protective Services*, No. 03-20-00531-CV, 2021 WL 1704258, at *8 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.). *M.D.*, however, presented vastly different facts than this case, *see id.* at *6-7, and in that case, we observed that "because it exposes the child to the possibility that the parent may be impaired or imprisoned, a parent's illegal drug use and drug-related criminal activity may support termination under subsection (E)." *Id.* at *8. We then cited our sister court's opinion, *see id.*, which stated, "Somewhere along the way, [that court of appeals] conflated drug use with child endangerment such that mere drug use became conclusive evidence that a child was endangered," *In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (en banc). However, we cited *L.C.L.* under a "*but see*" signal, meaning our sister court's opinion "clearly supports a proposition contrary to the main proposition." *See* The Bluebook: A Uniform System of Citation R. 1.2 (c) (Columbia L. Rev. Ass'n et al., eds., 21st ed. 2020). And contrary to Mother's contention, we did not suggest in M.D. that endangerment must be independently established and may not be inferred from parental misconduct alone. *M.D.*, 2021 WL 1704258, at *6 n.4 ("We recognize that 'endangerment' does not need to be established as an independent proposition but may, instead, be inferred from the parental misconduct alone.").

Fort Worth 2004, pet. denied) ("Despite B.B.'s contention that he had stopped drinking, using drugs, and being depressed prior to his involvement with this case, the jury was not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated before trial."). The trial court could have determined that given the evidence of domestic violence between Mother and Father, their ongoing relationship, Mother's abuse of a serious drug before and during the case, and her failure to maintain contact with C.R., Mother had engaged in a course of conduct that endangered C.R. *See, e.g.*, *R.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00528-CV, 2016 WL 6575235, at *3-4 (Tex. App.—Austin Nov. 3, 2016, no pet.) (mem. op.) (court could have found course of endangering conduct when mother admitted to having used methamphetamines weekly for past eight years; police officers had responded to three reports of domestic violence involving her and husband, who was also a methamphetamine user; and mother had no negative drug tests during case and did not complete domestic-violence classes or drug-addiction services); *J.C.-O. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00271-CV, 2016 WL 6068263, at *7 (Tex. App.—Austin Oct. 14, 2016, pet. denied) (mem. op.) (jury could have found course of endangering conduct from evidence of domestic violence between parents, father's enabling mother's drug abuse during case, and "volatile nature of their ongoing relationship"); *R.Z. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00412-CV, 2014 WL 5653272, at *6 (Tex. App.—Austin Oct. 29, 2014, no pet.) (mem. op.) (jury could have credited evidence of illegal drug use, domestic violence, and criminal activity before and after child's removal to find conscious course of conduct that endangered child). We overrule Mother's sole issue on appeal.

10

**CONCLUSION**

Having overruled Mother's issue, we affirm the trial court's order of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   August 6, 2021