# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00070-CV

---

**J. T., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 294,567-E, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

J.T. (Father) appeals from the district court's decree terminating his parental rights to his daughter, S.T.[1]  He contends that the trial court erred in ordering him to undergo a psychosexual evaluation, "delaying the final hearing indefinitely," and in granting two motions to withdraw filed by counsel.  He also challenges the court's findings of best interest and statutory grounds.  We affirm the termination decree, as explained below, beginning with Father's complaints related to the psychosexual evaluation and the withdrawal of his attorneys.

## PROCEDURAL SUMMARY

In November 2017, the Texas Department of Family and Protective Services filed a petition seeking conservatorship of S.T., who was born in October 2012.  The Department

---

[1] For the child's privacy, we refer to her by her initials and to her family members by their relationships to her.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

asserted that it had received reports of neglectful supervision, domestic violence, and possible sexual abuse; that Father worked as a truck driver or a large-load escort driver and thus was often away from the family; and that the Department had concerns about Mother's mental health and functioning. Father had removed S.T. from Mother's care in August 2017 and placed her with Steve and Linda, people he had met at a church, and at the time the Department filed its petition, Mother was "considered homeless and [] residing in a shelter." The trial court signed an order on November 6, 2017, appointing the Department as temporary managing conservator, and soon after, the Department removed S.T. from Steve and Linda and placed her with Sherry Roby, where she remained throughout the proceeding. By the time of the final hearing, Mother and Father were no longer together.

The final hearing commenced on October 31, 2018, *see* Tex. Fam. Code § 263.401 (unless trial court extends deadline based on finding of extraordinary circumstances requiring extension, trial on merits must commence by first Monday after first anniversary of temporary order appointing Department temporary managing conservator), and the Department stated that it was seeking to have Roby appointed sole managing conservator and that it was not seeking to terminate the parents' rights. In the hearing, Father asked for a new attorney, explaining that he did not believe his attorney (his second)[2] was representing his best interests and complaining that he had been barred from contact for seven months while Mother had been allowed "the opportunity to endanger" S.T. Father's attorney said that he had been unaware of Father's concerns and that he was able to proceed as Father's attorney. Noting the time limits on termination cases, the trial court decided to go forward, saying, "I can certainly understand

---

[2] The record does not reflect why Father's first appointed attorney withdrew. That first withdrawal and substitution of counsel occurred in January 2018.

2

[Father's] frustration based on what he said, but I don't believe that rises to the level of incompetence in his attorney and even an inability to adequately represent him in this matter." Mother and Father both testified, and at the end of testimony, the trial court and the attorneys discussed whether Father had been ordered to undergo a psychosexual evaluation and concluded he had not. The trial court said, "Well, it's ordered now," stating that because they had started the hearing, they had "met the statutory requirement. That being the case, I want this to be rescheduled to continue this final hearing but only after we have [Father's] psychosexual and I can also hear from [S.T.'s] counselor." Father asked if he could complete that exam in the next two days, explaining that he would probably have to leave the state soon for work, and the trial court said he should talk to the Department.

On November 9, 2018, Father's second attorney filed a motion to withdraw, stating that he and Father were unable to communicate effectively. The trial court granted the motion to withdraw on November 28—Father signed that order as "agreed"—and issued an order appointing a third attorney on January 2, 2019. On February 14, 2019, the third attorney also filed a motion to withdraw, stating there was "conflict with how to proceed with the case," and in March 2019, the trial court granted the motion and assigned a fourth attorney to represent Father. That attorney represented Father through the conclusion of the proceeding and continues to represent him on appeal.

In January 2020, the trial court signed a Rule 11 Agreement filed by the parties providing that: Roby would be appointed permanent sole managing conservator; Mother would be appointed possessory conservator and permitted visitation; Father would not be appointed either managing or possessory conservator and his visitation opportunities would be "at the recommendation of the Child's therapist, and shall always be supervised"; and Father would be

3

ordered to pay $230 a month in child support. On February 12, 2020, however, Father filed a motion to revoke the Rule 11 agreement and a request for trial. He asserted that he had withdrawn his consent because Roby had indicated "her intent to not comply with" the agreement and because the agreement was unworkable and unjust.

Father underwent the ordered psychosexual evaluation in June 2020, and the evaluation was filed with the trial court in late June. In its final permanency report, dated June 17, 2020, the Department stated that it was seeking the termination of Father's rights. The court resumed the final hearing on August 17, 2020.[3] Father was the only witness to testify, and the hearing was continued until October 23, 2020. In the October 23 hearing, Father testified again, along with Roby, the child's guardian ad litem, and a Department employee. The hearing concluded on January 6, 2021, and Father's brother (Uncle) was the only witness to testify. At the conclusion of the hearing, the trial court found that termination of Father's rights was in S.T.'s best interest and that his rights should be terminated under subsections (D), (E), and (O). *See id.* § 161.001(b)(1)(D), (E), (O). Although the court found that Mother should not be appointed managing or possessory conservator, it did not terminate her parental rights and provided that any contact between S.T. and Mother was left entirely to Roby's discretion.

### DELAY DUE TO COURT-ORDERED PSYCHOSEXUAL EVALUATION

We begin with Father's first issue, which asserts that the trial court erred in ordering the psychosexual evaluation. Father argues that "the trial court caused the trial to linger

---

[3] The termination decree states that a hearing also took place on January 3, 2020, but the record indicates that that hearing was not an evidentiary hearing and instead was limited to the trial court's approval of the Rule 11 agreement. The 2020 and 2021 hearings were held via video conference due to COVID-19. *See* Revised COVID-19 Administrative Order, Bell County Local Administrative District Judge, signed April 28, 2020.

for more than 2 years after the trial commenced," largely due to its sua sponte order that Father undergo the evaluation without setting a deadline for its completion. However, Father did not object to the trial court's order or lodge any complaints about the associated delay. He thus has not preserved any error associated with the delay due to the trial court's sua sponte order that he complete a psychosexual evaluation. *See In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 352-53 (Tex. 2003); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 709 (Tex. App.—Austin 2019, pet. denied). Even if error had been preserved, we cannot overlook the fact that the delay between the beginning of the final hearing on October 31, 2018, and its resumption almost two years later, on August 17, 2020, was in large part due to Father's delay in submitting to the evaluation. Father did not call his chosen psychologist to arrange for the evaluation until February 2020 and did not undergo it until June 2020, and Father testified that he did not delay because of cost or logistics but instead because he "disagreed" with the court's order, did not think he should have to undergo the evaluation, and thought "nothing positive" would come from it.[4] We overrule Father's first issue on appeal.

---

[4] Father also asserts that the trial court did not have a duty to order the evaluation mid-trial and that because the order "was not requested," it "did not vest the [court] with power to issue the order," citing *In re B.M.*, 228 S.W.3d 462, 465 (Tex. App.—Dallas 2007, no pet.), as support. However, *B.M.* does not stand for the proposition that a trial court lacks authority to sua sponte enter certain orders that it believes necessary for it to evaluate matters related to conservatorship or best interest. *See id.* (trial court abused its discretion by rendering final order on custody after hearing on motion to modify requesting only temporary relief). Father also argues that "trial courts do not have the inherent authority to create their own ad hoc [discovery] procedures," *In re Does 1-10*, 242 S.W.3d 805, 818 (Tex. App.—Texarkana 2007, no pet.), but it is well established that "[t]echnical rules of practice and pleadings are of little importance in determining issues concerning the custody of children," *Leithold v. Plass*, 413 S.W.2d 698, 701 (Tex. 1967). The trial court was tasked with determining whether Father had committed acts sufficient to terminate his parental rights and whether termination was in S.T.'s best interest and thus was empowered to gather evidence to evaluate the issues before the court. *See, e.g.*, *In re C.Z.H.-O.*, No. 03-17-00016-CV, 2017 WL 4900499, at *2 (Tex. App.—Austin Oct. 27, 2017,

## ISSUES RELATED TO COUNSEL

In his second issue, Father argues that the court erred in allowing his attorneys to withdraw after the final hearing had commenced in October 2018. He asserts that he was without effective representation for about four months, which he characterizes as a "critical stage" in the proceeding,[5] and that we should therefore presume prejudice as a matter of law.[6]

Father never objected in the trial court to the motions to withdraw, the trial court's granting of such motions, or any delay in the court's appointment of new counsel. In fact, he himself requested new counsel during the October 2018 commencement of the final hearing, asserting that he did not believe his attorney was representing his best interest, and signed the November 28, 2018 order granting second counsel's motion to withdraw as "agreed." Father has

---

no pet.) (mem. op.) (father sought modification of conservatorship, thus "imbu[ing]" trial court with "decretal powers" over conservatorship).

[5] The trial court's order granting Father's second attorney's motion to withdraw was signed on November 28, 2018, and its order appointing new counsel was signed on January 2, 2019. However, the court's docket sheet indicates that the second attorney was allowed to withdraw and the third attorney was appointed on the same day—November 28, 2018. It is thus unclear whether Father was without counsel at any point. Further, because his third attorney sought to withdraw only two months after being appointed on January 2, 2019, Father contends on appeal that he was effectively without counsel from the withdrawal of his second attorney in November 2018 until the appointment of his fourth attorney on March 20, 2019. However, even if we were to accept that characterization of Father's representation, as we explain later, Father cannot obtain reversal on the issue.

[6] Although Father does not assert that any of his attorneys were ineffective, he cites *Strickland v. Washington*, 466 U.S. 668 (1984), as support for his argument that prejudice should be presumed. *Strickland* sets out the standards for reviewing the effectiveness of counsel in criminal cases, *id.* at 687, and has been applied in Texas to parental-termination cases, *see In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (parent asserting ineffective assistance must show that attorney's errors were so serious that attorney was not functioning as "counsel" and that deficient performance prejudiced parent's defense). Appellant had counsel during each of the hearings and during at least most of the time the case was paused awaiting the evaluation, and he does not demonstrate that any of his attorneys were deficient in their performance. *Strickland* and its progeny do not require us to presume prejudice under these facts.

thus not preserved error related to the trial court's granting of his second and third attorneys' motions to withdraw and its orders appointing new counsel. *See* Tex. R. App. P. 33.1(a); *K.A.F.*, 160 S.W.3d at 928; *A.C.*, 577 S.W.3d at 709.

Even if the issue had been preserved, a trial court's granting of an attorney's motion to withdraw is reviewed for an abuse of discretion, *Sims v. Fitzpatrick*, 288 S.W.3d 93, 100 (Tex. App.—Houston [1st Dist.] 2009, no pet.), as is "the timing of the appointment of counsel for indigent parents," *Melton v. Texas Dep't of Fam. & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *3 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.). The lag, if any, between one attorney's withdrawal and the next attorney's appointment occurred while the case was paused awaiting the court-ordered psychosexual evaluation, and there is no indication that Father's delay in completing the evaluation was related to counsel or a lack thereof. Father has not shown that the trial court abused its discretion in granting the motions to withdraw while the proceeding was in abeyance, that his defense was prejudiced by the changes in counsel or any delay in the appointment of new counsel, or that the court's decisions related to counsel deprived him of his rights, caused the rendition of an improper judgment, or prevented him from presenting his case on appeal. *See* Tex. R. App. P. 33.1(a), 44.1(a); *K.A.F.*, 160 S.W.3d at 928; *A.C.*, 577 S.W.3d at 709. We overrule Father's complaints related to counsel.

## "INDEFINITE" DELAY OF THE FINAL HEARING

As part of his second issue, Father also argues that the trial court erred in allowing the final hearing to remain pending over a period of more than two years, during which time the Department changed its permanency goal, asserting that but for the delay, his rights would not

have been terminated. However, as with his first two complaints, Father did not object to the delay in the case and has not preserved error. *See* Tex. R. App. P. 33.1(a); *K.A.F.*, 160 S.W.3d at 928; *A.C.*, 577 S.W.3d at 709. Furthermore, as noted earlier, the lengthy delay between the trial court's timely commencement of the final hearing and the hearing's conclusion more than two years later rests primarily with Father, who did not undergo the psychosexual evaluation for about eighteen months because he "disagreed" with the trial court's order. We overrule Father's second issue on appeal.

## SUFFICIENCY OF THE EVIDENCE

Finally, we turn to Father's third, fourth, and fifth grounds, in which he argues that the evidence is insufficient to support the trial court's findings that Father had knowingly placed S.T. or allowed her to remain in conditions and surroundings that posed a danger to her physical and emotional well-being, *see* Tex. Fam. Code § 161.001(b)(1)(D); engaged in conduct and knowingly placed S.T. with others who engaged in conduct that endangered the child's well-being, *see id.* § 161.001(b)(1)(E); and failed to comply with a court order setting out the actions necessary to regain custody of S.T., *see id.* § 161.001(b)(1)(O). He also challenges the court's finding that termination of his rights was in S.T.'s best interest. *See id*. § 161.001(b)(2).

### *Summary of the Evidence*

The Department's November 2017 removal affidavit, prepared by Shannen Wilson, was introduced into evidence. Wilson explained that the Department had received an initial referral in August 2017 alleging neglectful supervision by both parents. Five-year-old S.T. was quite developmentally delayed—she was unable to speak in comprehensible sentences and could only say "hi" or "bye"—and although the family had moved to Texas about two years

8

earlier, the parents had not yet obtained "medical insurance, shots or well child checkups" and had "failed to follow up with any further assessments or determination of [S.T.'s] needs." Wilson also stated that Mother alleged that Father had raped her, that there were reports of domestic violence by Mother against Father, and that there were concerns about Mother's overall level of functioning and her mental health because she had become depressed and unable to care for the child.

Around the time the Department received the August 2017 referral, Wilson averred, Father had removed S.T. from Mother's care and placed her with Steve and Linda, people he had met at a church. Wilson explained that between August and November, when the Department filed its petition, the Department initially tried to work with the parents but then decided to seek custody because of ongoing concerns about S.T.'s safety and well-being. At the time the Department filed its petition, Mother was "considered homeless and [was] residing in a shelter," was not able to provide for S.T.'s basic needs, had not attempted to find insurance or resources to meet S.T.'s needs, and was not functioning at a level that would allow her to care for S.T. Father had been out of state for work for the last four weeks, had only been in Texas for four days, said he was aware that he could not provide a stable home, and had asked that his family in Connecticut be considered a placement option.

Wilson also averred that in early October 2017, the Department received a report that S.T. had made an outcry that "Old Daddy" or "Yucky Daddy" had "touched her as she rubbed her vagina" and that S.T. had been observed "hump[ing]" a stuffed animal. The child was interviewed, but because her communication abilities were severely delayed, she could not "effectively communicate a clear outcry." However, Wilson said that S.T. "did make an outcry to the investigator in regards to sexual abuse" and that the Department was concerned "that

9

something has occurred, but at this time without [S.T.] being able to articulate and or show what happened it is unclear specifically what she endured." Finally, Wilson averred that because Father had been on the road for work, he had been unable to complete his Department-recommended services and had not yet been interviewed "in respects to the outcry of the sexual abuse at this time." Father had said he was "worried that [S.T.] may have been sexually abused by an individual when Mother took her to Connecticut" for a visit.

Mother testified in the October 2018 hearing that she visited S.T. at Roby's house frequently and that Roby takes "excellent care" of S.T. Mother explained that S.T. has special needs—learning disabilities and problems with her legs—and requires "quite a bit of care," including therapy, occupational therapy, and "other things like that." Mother said that Father had sold drugs when they lived in another state several years before and that he smoked marijuana almost daily. She also said that "he raped me twice but I didn't have proof of it," explaining that several months earlier, "I asked him nicely to give me a back massage and he forced himself on me twice." Mother was asked if she thought S.T. would be safe around Father, and she answered, "Not really." Father testified that he had not seen S.T. in several months and that at the beginning of the case, he "was following all the services" and "trying to do the best [he] could." However, he admitted that he had been dropped by his therapist; he had used marijuana more than fifty times in the last year; he last used it three or four weeks before the October 2018 hearing; and he had not taken all the requested drug tests, saying he did not know where to go for them. Because his work did not allow him to care for S.T. "day-to-day," he asked that he be given sole custody but that she be placed with his parents in Connecticut. At the conclusion of testimony, the trial court ordered Father to complete a psychosexual evaluation and stated that the hearing would resume after the evaluation was complete.

10

Father finally completed the evaluation in June 2020, and the hearing resumed in August 2020. In the August hearing, Father testified that he traveled the country for work and lived in his girlfriend's apartment in South Dakota. He explained that he was the person who made the initial August 2017 report to the Department, saying S.T. was about to start school and Mother "wasn't doing what she needed to do to be a good mother, and [he] didn't know what to do." Father testified that he had made the report hoping that the Department could offer assistance when S.T. missed school while he was on the road for work. Father acknowledged that he was aware that Mother, who he had known since they were fifteen years old, was "a little low functioning and [had] low I.Q." and that despite that knowledge, he had moved Mother and S.T. from Connecticut to Texas and taken a job requiring him to be away from home much of the time. Father said that when they first moved away from their families, Mother "was doing very well under [his] care," but he eventually called the Department for help because he "didn't know where to go."

Father denied that he had raped Mother or abused S.T. and testified that he had never been charged with sexual abuse of a child. Father testified that S.T.'s allegation about "Old Daddy" referred not to him but to Steve, the husband of the couple with whom Father had placed S.T. Father was asked whether he had "found some random strangers at a church that was not your own" and placed S.T. with them, and he admitted that he, Mother, and S.T. did not know Steve and Linda and that he "went with [his] faith." In November 2017, the Department removed S.T. from that home and placed her with Roby, and Father testified that he believed the removal occurred because Steve or Linda had failed a drug test. Father was asked why he did not send S.T. to live with his family in Connecticut, and he said, "I had a choice of being the responsible daddy and call the government for help or take my kid and run all the way back to

11

Connecticut and worry about an AMBER alert and a kidnapping call because we're talking about a woman who claimed I raped her."

Father testified that he had cooperated with the Department until the psychosexual exam was ordered in October 2018. He said he took a hair follicle drug test as ordered and complained that hair was "ripped off" his leg for that test, drawing attention from other people and requiring him to explain what had happened. He had not taken any urine tests and stated that he did not "believe" he had been requested to do so and that drug tests are not easy to obtain when he is working. However, asked whether he had been able to "get the Department to give [him] drug screenings" when he was in town, Father said he had not "[b]ecause it would take time for [him] to get clean." Father admitted that he had continued to use marijuana throughout the proceeding, saying, "It's the only thing keeping me sane." Father had been unsuccessfully discharged from therapy, and although he testified that therapy was "just medically hard making sure insurance—getting it through the right way," he also acknowledged that the Department had helped him find a therapist and tried "to help me stay with the same counselor, but he canceled it." Father had not attended other therapy after his unsuccessful discharge, saying, "I haven't really looked into it. But to be honest with you, I bet you it would be a lot easier now that COVID started. I haven't looked into much of that yet."

Father testified that he had not been able to have "positive" communications with his Department caseworker and had requested a new one. He had not spoken to S.T. for three years and said he "just want[ed] to say hi to my daughter and tell her I love her." Father testified that he had complied with the requirement that he arrange for an appropriate home for S.T.—with his family in Connecticut—and that he had sent small sums of child support and had sent

12

flowers to S.T. several times but that Roby at least once rebuffed his attempt to pay her child support and had refused his most recent attempt to send flowers.

Father was asked, "Since the judge indicated he would not take up this hearing until you got [the psychosexual evaluation] done, why would you take two years to get it done, or a year and a half?" He answered, "Because that does not correlate to the rights that I was given from the very beginning when I kept asking. I should have been able to have communication with my daughter still. I mean, what harm—That's my answer." When the Department noted that he had allowed S.T. to remain in foster care for eighteen months because he "thought it was wrong" that he was ordered to do the evaluation, Father responded, "She was safe." He further said, "I knew what CPS wanted me to do, yes, and I disagreed," explaining that the Department asked him to "incriminate [him]self with" that exam and that "nothing positive" would come from it. He said, "It's not going to make a decision on if I did or didn't do something. It would basically just say if I could do something. And it was supposed to be innocent before proven guilty, and I've done nothing wrong." In February 2020, Father finally contacted a psychologist in South Dakota about completing the psychosexual evaluation, which was conducted in June 2020 via video call. Father testified that Uncle paid between $3,000 and $6,000 for Father's evaluation. Asked whether he knew that the Department "could have done it for free," Father said, "It wasn't the money," and, "I didn't feel that it would be a fair thing to even do in the first place, let alone go with the people that I'm trying to deny taking it with." The psychologist recommended that Father do further testing and counseling, but Father said he did not have the resources to do that.

Roby testified at the October 2020 hearing that when S.T. came to live with her in November 2017, she "was almost nonverbal," had to pantomime what she needed or wanted,

13

"was afraid to step off a curb," and could not count to five. Roby sought professional help for S.T. and started her in speech therapy, occupational therapy, and physical therapy. As a result, Roby testified, S.T. has "come far in overcoming" those delays. Roby said she "[a]bsolutely" intends to raise S.T. to adulthood, and she testified that S.T. is the "delight of [Roby's] life. Roby further said that S.T. got "all As and Bs" in her classes; her math skills have improved; she is now a "Chatty Cathy" and loves to talk and tell stories; her speech is easier to understand; and she responds to and can answer questions.

Roby testified that when Father had in-person supervised visitation, "it became apparent that it wasn't good for" S.T. Roby said, "He was trying to do his best, but around him [S.T.] was very excitable. He liked to—He wanted to roughhouse with her." Roby was "uncomfortable" with the roughhousing and said that after such visits, S.T. showed "frightening" "manifestations." Roby explained that after one visit, S.T. was asked to pose for a photograph and sat down and "spread her legs." Another time, S.T. "inserted her finger into her vagina and licked it, licked her finger," and when Roby asked where she learned to do that, S.T. said, "My daddy," clarifying that she meant "Old Daddy." Roby testified that S.T. says she "has an Old Daddy and an Old Mommy and a New Daddy and a New Mommy," that Mother and Father "are Old Mommy and Old Daddy because she had them first," and that her first foster parents, Steve and Linda, are New Mommy and New Daddy. Roby also said that S.T. had acted out sexually during church nursery school—she "would pull the little boys down, get on top of them and hump." As of October 2020, it had been six months since S.T.'s last episode of acting out sexually, and Roby said that was the longest she had gone without exhibiting such conduct. Roby said that she has "no doubt" that S.T. was sexually abused by Father.

14

S.T. has had no contact with Father since the Department recommended that his contact be stopped, and when asked whether she thought Father should have visitation, Roby answered, "Absolutely not. . . . I don't want that child put through what she was put through before." She said that Father cannot control his impulses and that "[i]f he's upset about something, he's going to scream and yell and get loud and whether—and try to make her understand that he's the one . . . that has been wronged. . . . He constantly does it. I don't want her under that kind of pressure." She "absolutely" thought contact with Father would be harmful to S.T., "[e]ven in a controlled environment":

> An example: a phone call with [Father] where he ranted and raved about how CPS was treating him unfairly and that when I—of course I'm on the phone call, too, and I said, "Please don't do that." And he screamed that she needed to know how he was being treated. I had to cut the conversation short because [S.T.] was in tears.

Roby had learned to observe when Father was "escalating" and to cut him off at that point. Roby said she had refused to accept the flowers from Father on the advice of the Department, which had told her "[t]hat's not a good idea."

Debbie Belviy testified that she had been S.T.'s guardian ad litem for two years. When she first met S.T., Belviy "could hardly understand anything she said," and Roby "pretty much had to translate about everything" S.T. said. Now, Belviy "can understand her for the most part," and she said S.T. is "a very happy little girl"; is "very, very comfortable with Ms. Roby"; and had "made a lot of progress in the last two years." Belviy had no concerns about Roby's care for S.T. and testified that Roby was a good and protective supervisor. She also said that counseling had been good for S.T. and that S.T. was also undergoing physical therapy, occupational therapy, and speech therapy.

15

Belviy, who had spoken to Father "a couple" of times, thought that contact with Father "would be detrimental to the progress that [S.T.] has made in this case." She believed termination of Father's rights was in the child's best interest because, based on "conversations I've had with him and the mannerisms that he shows—that he has shown in court, I don't believe that he would leave Ms. Roby alone, and so I don't believe just restricting his contact would be enough at this point." She also said Father "has a habit of going out on these rants" about how the Department has wronged him and did not think it would be in S.T.'s best interest to be subjected to those conversations. She further testified that when S.T. had contact with Father, "it would cause problems for her. She would start regressing a little bit." Belviy spoke to S.T.'s counselor about that regression because she thought the counselor "would be more apt to be able to tell me about the contact, what her recommendation was, and she does not believe contact—And, you know, she's a professional, she's worked with [S.T.], and I have to, you know, go along with her findings on this." Belviy said that after the last hearing, she had spoken to S.T.'s therapist, who thinks contact with Father "would do more harm than good."

Department conservatorship supervisor Beverly Davis testified that Roby had "provided excellent care" for S.T., that Davis had seen the child "grow and thrive," and that S.T. "has been doing excellent without contact with her father." Although Father had completed a psychological evaluation, had "self-reported employment, and recently took the psychosexual" exam ordered by the trial court, Davis testified that overall he had made "nearly no progress on his family plan," he had not begun individual counseling, he had felony drug charges pending against him, and he had not undergone required monthly hair follicle drug tests in the last two years. Davis also thought the fact that it took Father so long to comply with the psychosexual requirement was "concerning." Davis noted that the Department had difficulty assisting Father

16

with services because of his work and his "being essentially out of state the entire case." Davis thought termination of Father's rights was in S.T.'s best interest rather than allowing to him retain his rights while Roby was named permanent managing conservator because Father "would still have legal rights to" S.T. Father had stated that he wanted "full access" to anyone S.T. interacted with, and Davis worried that given the "concerning nature" of Father's behavior, he would "hassle" Roby, S.T.'s school, her therapist, and "anything that she was involved in."

Uncle testified at the final day of the hearing and said he last saw S.T. in October 2017, when she was living with Steve and Linda. During that visit, S.T. called Steve "Dad," Uncle never heard her call Steve "Old Dad," and Uncle saw S.T. "riding [Steve's arms] like a horse-type situation. A little humping at that time." Uncle said that Father had provided for S.T.'s physical and emotional needs before her removal. Asked if he thought Father could currently provide for S.T., he answered, "Well, I mean, he's on the road. I think the best option is my parents or myself to provide the home that she needs since his work is where he's on the road. She needs a stable home with family and friends available." Uncle said that Father misses S.T. and "that's why at times he does get upset" and did not think Father should be barred from seeing her. He believed that Father was making slow progress in improving his situation and his lifestyle and that Father would engage in counseling as recommended by his evaluations. Uncle said that he and his parents were able to care for S.T. if she were placed with them and that he would abide by court orders as far as whether to allow Father to have contact with S.T.

### *Standard of Review*

To terminate a parent's rights to his child, the Department must prove by clear and convincing evidence that he engaged in conduct that amounts to at least one statutory ground

17

for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is proof "that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to the finding but otherwise assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.*

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Subsection (D) focuses on the child's environment, while subsection (E)

18

focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home" is part of the environment under subsection (D). *Id.*

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

*Statutory Grounds under Subsections (D) and (E)*

"[S]ubsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E)." *M.V. v. Texas Dep't of Fam. & Protective Servs.*, 446 S.W.3d 879, 889 (Tex. App.—El Paso 2014, no pet.); *see V.P.*, 2020 WL 544797, at *4. A parent's decision to leave his child with caregivers who are not

competent can support a finding that he exposed the child to risk of loss or injury. *See In re N.P.*, No. 09-20-00218-CV, 2021 WL 203339, at *7 (Tex. App.—Beaumont Jan. 21, 2021, pet. denied) (mem. op.). Father testified that he knew Mother was low functioning but decided to relocate her and S.T. to Texas from Connecticut, where they both had family support. Once here, Mother struggled to care for S.T. to such a degree that Father removed S.T. from Mother's care, placed her with Steve and Linda, and called the Department seeking assistance. Father did not testify that he tried to be home more often or that he asked family or friends for help, and he said he did not seek to send S.T. to live with family in Connecticut because he did not want Mother to accuse him of kidnapping. However, in placing S.T. with Steve and Linda, whom he conceded he did not know, he placed her in a home the Department later determined was unsafe, whether because of a failed drug test, as Father believed, or because Steve was, as Father testified, the man S.T. referred to as "Old Daddy." Thus, although Father argues that the Department did not establish that S.T.'s living conditions put her well-being at risk because he had "placed her with someone he was confident would be able to care for her," Father's testimony indicates that he placed her with people he did not know, against whom S.T. may have made an outcry of sexual assault.

Father asserts that because he worked out of state, leaving Mother as primary caretaker, he "could not have 'placed' [S.T.] in any conditions or surroundings" and "could not have exercised any discretion to 'allow' [S.T.] to remain anywhere but with" Mother. However, the fact that his employment requires him to be out of state does not remove his responsibility for ensuring that S.T. was in a safe environment. And, as we have observed, he moved Mother and S.T. from Connecticut, where they had family for support and assistance, to Texas, where they apparently had no one to turn to for help. When he did "exercise his discretion," by removing

20

S.T. from Mother's care and placing her with Steve and Linda, he placed her in a home that, according to his own testimony, posed risks to her physical and emotional well-being. The evidence in this record thus supports the trial court's finding that Father knowingly placed or allowed S.T. to remain in conditions or surroundings that endangered her well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D). Because the evidence is sufficient to support the court's finding under subsection (D), we need not consider whether the evidence also supports the findings under subsections (E) or (O). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

As for best interest, the evidence established that Father's work requires substantial travel out of state; that he did not cooperate with the Department's efforts to help him find and maintain a therapist; that he continued to use marijuana throughout the proceeding; and that he refused to submit to the ordered psychosexual evaluation for more than a year, leaving S.T. in an impermanent foster-home situation, simply because he did not agree with the order. Mother testified that Father had raped her and that she did not believe S.T. would be safe in his care. As discussed earlier, Father made questionable choices related to S.T.'s living conditions, and Roby testified that Father's visitations were not good for S.T. and that she had no doubt that Father had sexually abused the child, providing disturbing details about S.T.'s behavior after her interactions with Father. Roby, Davis, and Belviy all testified that Father has trouble controlling his impulses and behavior and that it would be harmful for S.T. to be exposed to his "rants." In addition, S.T.'s therapist told Belviy that contact with Father "would do more harm than good." Davis and Belviy testified that Roby was providing excellent care and that S.T. was thriving in that home. Roby said she intended to raise S.T. to adulthood and testified about improvements in the child's development and behavior. Roby, Davis, and Belviy all testified that termination

21

of Father's rights was in S.T.'s best interest. Weighing the evidence presented under the *Holley* factors and bearing in mind the trial court's role as factfinder, we conclude that sufficient evidence supports the court's finding that termination of Father's parental rights is in S.T.'s best interest. *See C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 371-72.

Because the evidence is sufficient to support the trial court's finding on best interest and of statutory grounds under subsection (D), we overrule Father's fourth issue, which challenges the court's findings of endangerment.

## CONCLUSION

We have overruled Father's issues related to the psychosexual evaluation, the delay in the conducting of the final hearing, and the withdrawal of two of his attorneys. We have also held that sufficient evidence supports the findings of subsection (D) grounds and best interest. We therefore affirm the trial court's decree terminating Father's parental rights.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   June 30, 2021

22