# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00435-CV

---

**M. J., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 318,578-B, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

M.J. (Mother) appeals from the trial court's final order terminating her parental rights to four of her children and declining to appoint her as managing or possessory conservator of her fifth child.[1]  Mother challenges the sufficiency of the evidence to support the trial court's termination and conservatorship findings.  *See* Tex. Fam. Code §§ 153.131(a) (conservatorship), 161.001(b)(1)(D), (E), (N), (O), (2) (termination).  We will affirm the final order.

### SUMMARY OF THE EVIDENCE

The following witnesses testified at the July 6, 2021 bench trial: Department conservatorship worker Courtney Robinson, Mother, and A.W. Sr.  The trial court admitted several documents into evidence without objection: the Department's removal affidavit, a

---

[1] The trial court terminated the parental rights of the father (M.J. Sr.) of Mother's four eldest children and appointed the father (A.W. Sr.) of Mother's youngest child as that child's managing conservator.  Neither father is a party to this appeal.

Kinship Caregiver Home Assessment the Department performed on the children's cousin, the results of several drug tests taken by Mother and her boyfriend during the pendency of the case, and the Department's final report to the court. The court also took judicial notice of its file, which included a copy of Mother's court-ordered family service plan. Per the family service plan, Mother was required to participate in supervised visitation; maintain a safe, clean, and appropriate home and allow for scheduled or unscheduled Department visits to the home; maintain employment sufficient to meet her needs and her children's needs; demonstrate the ability to meet her children's needs and ensure their safety; complete a psychological evaluation and follow its recommendations; participate in individual counseling, from which she would be discharged if she missed two appointments; complete a drug and alcohol assessment (OSAR) and follow its recommendations; abstain from the use of illegal drugs; submit to random drug tests weekly, with the admonishment that a failure to test would constitute a positive test and that a positive test would permit the Department to abate Mother's visitations with her children (as would Mother appearing for visitation under the influence of illegal drugs); and provide the Department with a list of any medications a licensed physician prescribes her.

### *The removal affidavit*

In the removal affidavit, Department caseworker Shantara McKnight averred that on June 27, 2020, the Department received a report alleging that Mother was emotionally abusing the eldest child, Mabel (then thirteen).[2] Mabel was allegedly "cutting herself due to [Mother's] mistreatment" of her. The report alleged that Mother sells her food stamps instead of buying food, that the family (including Mother's boyfriend) lives in a two-bedroom apartment

---

[2] For the children's privacy, we refer to them by pseudonyms and to their family members by their relationships to them. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

with only one set of bunk beds for the five children, and that seven-year-old Albert had never attended school.

McKnight averred that she made telephonic contact with Mabel's aunt (Aunt) on June 29, during which conversation Aunt shared the following: Mabel had been cutting herself and had written "help" on the bedroom wall; Mabel had told Aunt that Mother "beats her like an adult," "physically and verbally abuses" her, and "forces her to watch the younger children while she roams the streets looking for" Mother's boyfriend; Aunt is concerned that Mother is using methamphetamine and cocaine; Albert was not enrolled in school; there is no food in the home because Mother had sold her food-stamp benefits; and Aunt "had" the children from 2013 to 2018 and "regrets giving them back" to Mother.

McKnight visited the family later the same day and, upon arrival, learned from the Killeen Police Department that it had just returned Mabel home and that she had been reported as a runaway since June 25. Mabel stated that she did not want to be in the home or around her mother and that she wanted to hurt herself; McKnight observed that the child had "healing cuts on her right upper leg." Mother took Mabel to the emergency room to be evaluated. On June 30, McKnight met with the family again, and Mother informed her that Mabel had been released from the hospital with "no concerns." Mother also stated that the hospital recommended that both she and Mabel follow up with counseling and mental health professionals to address "both her and [Mabel]'s mental health." Mother denied having any history of using illegal drugs, including marijuana, but her boyfriend admitted to smoking marijuana two or three times a week at a friend's house. Mother disclosed that she had been diagnosed with bipolar disorder and depression in 2013 but "is not taking medication." Mabel

told McKnight that Mother at times "will be happy and then she changes" and that "the things [Mother] says can be harsh and [Mabel] takes them to heart."

Mother and her boyfriend agreed to take drug tests on July 7. Mother's test was positive for amphetamine, methamphetamine, and marijuana. Her boyfriend's test was positive for amphetamine, methamphetamine, cocaine, and marijuana. The levels of illegal drugs for both Mother and her boyfriend were "very high." When asked about the positive tests, Mother and her boyfriend admitted to smoking marijuana on July 4 but denied using any of the other identified drugs.

*The Kinship Caregiver Home Assessment*

The Department performed a home assessment on the children's maternal cousin (Cousin) to determine whether the children could be placed there during the pendency of the case. The assessment states that Mother filed a missing-person report about Mabel even though she knew Mabel had gone to another cousin's home and that Mabel had told police officers when they found her at her cousin's house that she did not want to go home because she felt "unsafe" there. The report also stated that when Cousin asked Mother whether she was aware that Mabel had been cutting herself, Mother "laughed and said 'Yeah, I know'" and "did not appear concerned." Mother admitted to Cousin that it was not true that Mabel had run away. Cousin reported that Mother's youngest daughter, Mia (then eight), had told her that she saw Mother "doing white stuff." Cousin reported that she knows Mother "smokes weed" and that she believed "there is a need to protect the children from their parents."

4

***The Department's final report to the court***

The Department filed its final report about a month before the bench trial. In the report, the Department stated that neither Albert nor Mia had been enrolled in school "due to not having the appropriate vaccinations." The Department's report noted that its permanency goal for the four eldest children had changed since the inception of the case to unrelated adoption because Mother "continues to test positive for Methamphetamine, Amphetamines, and Marijuana." Although Mother completed her OSAR evaluation, she did not submit proof to the Department of her completion of the recommended outpatient rehabilitation. Also, Mother had been "discharged from Individual Counseling due to her lack of participation." While Mother "reports that she completed a mental health assessment . . . [she] has not provided any documentation of the assessment." Mother had been "participating in virtual visits with her children until the visits were canceled, by the Department, due to concerns of [Mother] being under the influence while virtually visiting with her children."

Mabel was "currently participating in individual therapy to address history of neglect and trauma of being removed" and would "benefit from continued individual therapy services" and appropriate modifications at school with respect to her ADHD. Mabel was taking four different medications to address her depression, psychosis, and ADHD. Max (then thirteen), Mona (then eleven), and Mia were also participating in weekly individual therapy, at which sessions they spoke about "the neglect and abuse [they] experienced and witnessed while living in the home," but were otherwise in good health and not taking any medications. The Department's concurrent permanency goal for Albert "has not changed since the inception of this case" and was for relative or fictive-kin conservatorship.

5

The report indicated that Mother completed a psychological evaluation on October 8, 2020. The evaluation stated that Mother "does not currently appear to be a suitable independent parental resource." As for visitation with the children, Mother was "only allowed virtual visits" due to testing positive for methamphetamine and amphetamine. A March 15, 2021 virtual visit was ended early "at the request of" the children because Mother was driving and had "passed the phone to her mother who did not engage the children in conversation." At a March 30, 2021 hearing, the court ordered that visitation would continue at the Department's discretion, and the Department thereafter decided to cease virtual visitation. Although Mother "reported to Caseworker Robinson that she completed a mental health evaluation . . . and was prescribed medication" and informed Robinson that she would receive her medications within thirty days, Mother had not provided the Department with proof of the evaluation or of her prescriptions and "has yet to address the concerns for her mental health."

The report indicated that A.W. Sr. "currently lives in Boligee, Alabama, with his mother, in a three-bedroom, two bath home." Robinson virtually visited him to view his home and saw an "ample amount of space and sleeping quarters" and that the home was "clean but cluttered" with no visible safety hazards. A.W. Sr. had participated in virtual and in-person visits with Albert and "was appropriate in his communication" with the child. A.W. Sr. "reports that he is currently employed and pays his bills . . . [and] is able to meet his own basic needs" and Albert's. While A.W. Sr.'s family service plan required him to test weekly, the plan noted that the Department had the discretion to decrease the number of tests it required of him, which presumably it did after he tested negative twice. The final report also noted that A.W. Sr. did not participate in individual counseling or complete a psychological evaluation at his own expense,

6

as required by his family service plan. Nonetheless, the Department recommended that A.W. Sr. be appointed sole managing conservator of Albert.

*Testimony*

Robinson testified that "[o]ut of 50 drug tests [Mother] tested positive 20 times for methamphetamine, marijuana or amphetamines" and did not "test at all" about twenty-eight times. She testified that Mabel has "mental health concerns," for which she sees a psychiatrist and is on medication. Robinson explained that the Department's permanency plan for the four eldest children is fictive-kin adoption with a licensed foster mother in California and that the foster mother, who had previously cared for the children, desired to adopt the four children. The foster mother was in the process of completing a home study and becoming approved by the Department through the Interstate Compact on the Placement of Children (ICPC). Robinson believed that there was a "reasonable probability" that the four children could be adopted by the foster mother in a "short period of time" and explained that the foster mother had expressed to Robinson that "she was all in" for these children. As for Albert, the Department's permanency plan was for his father, A.W. Sr., to have custody.

Robinson testified that Mother had had a year to complete her family service plan but had been unsuccessful with at least the counseling requirement and completion of drug rehab because Robinson was unable to verify Mother's representation that she was currently in outpatient rehab. Mother had not permitted Robinson to conduct an in-person visit of her residence because Mother believed there was "no point" to the visit and that the Department was not planning to return the children to her. When Robinson twice attempted to call Mother to conduct a virtual visit of Mother's residence, as Mother had suggested, Mother did not answer the phone.

Mother testified that she had been participating in outpatient drug rehab for five weeks at Austin Recovery and had not used methamphetamine for three-and-a-half months.[3] She testified that although her most recent drug test was positive for marijuana,[4] she had not been using marijuana at the time and believed the test was positive because the drug had been in her system from previous use. She testified that she believed if Albert were placed with A.W. Sr., the child would be in "danger" because of A.W. Sr.'s unspecified "illegal activities." She testified that she was currently renting a three- or four-bedroom home that was big enough for all her children and that the home had sufficient beds, food, and electricity. She explained that she makes about $1,500 per month cutting hair and about $950 per month in social security disability. In response to her counsel's question about what she wanted the court to know about her ability as a parent, Mother explained, "2020 was a bad year for me . . . all I want to do is just continue to do what I'm doing, you know, to get all five of my kids back because I'm nothing without them and they [are] all I have."

A.W. Sr. testified only briefly, stating that he was asking the court to do what it "think[s] is best" regarding terminating Mother's rights to Albert but that he would like the court to consider giving Mother no conservatorship designation and ordering her to pay child support. The guardian ad litem represented to the court that he had spoken recently with Albert, who told him that he wanted to be placed with his father. He recommended termination of Mother's rights to the four eldest children because Mother had "not shown the ability to be an appropriate parent based on her actions during this case with the drug use."

---

[3] A May 18, 2021 drug test admitted into evidence showed Mother positive for methamphetamine and marijuana.

[4] The most recent drug test admitted into evidence was from May 28, 2021—about five weeks before trial—and showed Mother positive for marijuana but negative for several other illegal drugs, including amphetamine, methamphetamine, cocaine, and heroin.

## STANDARD OF REVIEW

To terminate a parent's rights to her child, the Texas Department of Family and Protective Services must prove by clear and convincing evidence that the parent engaged in conduct amounting to statutory grounds for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

We defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In reviewing legal sufficiency, we consider undisputed evidence contrary to the finding but assume the factfinder resolved disputed facts in favor of its finding. *A.C.*, 560 S.W.3d at 630-31. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the factfinding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.* at 631. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against the evidence favoring the finding and ask whether a reasonable factfinder could not have weighed the evidence in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

Termination of the parent-child relationship may not be ordered under subsection (D) unless clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) unless the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). Subsection (D) focuses on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

Both subsections require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 698–99 (Tex. App.—Austin 2019, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. "Endangerment does not need to be established as an independent proposition but may be inferred from the parental misconduct." *A.C.*, 577 S.W.3d at 699. Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*,

10

342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being, *A.C.*, 577 S.W.3d at 699. A trial court may "infer that a parent's lack of contact with her child and absence from the child's life endangers the child's emotional well-being." *V.P.*, 2020 WL 544797, at *4.

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; the child's emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, no one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27–28 (Tex. 2002); *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *7 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). Also, although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26.

## DISCUSSION

In her first issue, Mother contends that the evidence was legally and factually insufficient to support each of the trial court's statutory-predicate findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). Because, as outlined below, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need

11

not address Mother's challenges to the trial court's findings as to the other three subsections. *See J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00881-CV, 2020 WL 2183127, at \*4 (Tex. App.—Austin May 6, 2020, pet. denied) (mem. op.).

Evidence showed that before the Department removed the children Mother had been physically and emotionally abusing Mabel, knew about but had not taken seriously Mabel's self-harm, made a false allegation to the police about Mabel's running away, had been diagnosed with bipolar disorder but was not taking medication for the condition, had not enrolled two of her school-age children in school, and was using illegal drugs (as was her live-in boyfriend), sometimes in front of the children. The record shows that Mother's illegal-drug use continued throughout the pendency of the case and includes copies of several of her tests. During the approximate year from when the Department filed its original petition until trial, Mother tested positive for illegal drugs twenty times—on average, more frequently than every three weeks— and was presumed to have tested positive nearly weekly based on the number of times she failed to test.

Although at trial Mother testified that she had not used methamphetamine for three-and-a-half months and had been in outpatient rehab for five weeks, the drug-test result from mid-May 2021 belied her representation about methamphetamine, and she had not provided the Department with verification of her rehab participation. Further, the trial court was the sole arbiter of Mother's credibility. *See A.B.*, 437 S.W.3d at 503. Mother's continued drug use during pendency of the case—which jeopardized her ability to continue visitation with her children while she was at risk of losing them—combined with her pre-removal endangering and neglectful conduct, supports a finding that she engaged in a course of conduct that endangered the children's emotional or physical well-being. *See D.H. v. Texas Dep't of Fam. & Protective*

12

*Servs.*, \_\_\_ S.W. 3d \_\_\_, No. 03-21-00255-CV, 2012 WL 5098308, at *5 (Tex. App.—Austin Nov. 3, 2021, no pet. h.) ("[T]his and numerous other courts of appeals have recognized that a parent's decision to use illegal drugs while the termination suit is pending, and the parent is at risk of losing her child, may support a finding of endangering conduct under subsection (E)."); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct.").

After carefully reviewing the record, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that Mother engaged in conduct that endangered the physical or emotional well-being of her children. *See* Tex. Fam. Code § 161.001(b)(1)(E); *A.C.*, 560 S.W.3d at 630–31. We need not analyze Mother's arguments under any of the other statutory-predicate subsections because proof of only one of them carries the Department's burden under Section 161.001(b)(1). We overrule Mother's first issue.

### *Best Interest*

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in her children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). While there is little or no evidence of several of the *Holley* factors—and we will address only those for which there was evidence—we nonetheless conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's rights to the four eldest children was in their best interest.

As for the children's desires, the only evidence concerned Mabel, who had expressed that she did not feel safe at home, had been emotionally and physically abused by Mother, and did not want to return home after the police found her in response to Mother's false

13

runaway report. As for the children's emotional and physical needs, Mabel has significant mental-health issues and was on several medications at the time of trial, but the other children were generally in good health with no unique or special emotional and physical needs. The third *Holley* factor—present and future danger to the children—weighs heavily in favor of termination due to Mother's continued drug use; failure to seriously address her own mental-health issues; physical and emotional abuse of Mabel; and apparent limited parental abilities as evidenced, for example, by her failure to enroll two of her children in school and to take seriously Mabel's self-harm.

The trial court reasonably could have inferred from the evidence of Mother's illegal-drug use prior to the Department's involvement and significant use during pendency of this case that her drug use would recur, that she would be unwilling or unable to address her mental-health issues by taking her medication regularly, and that she would be unable to provide the children a safe and stable home environment. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 Tex. App. LEXIS 5115, at *50 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) (explaining that illegal-drug use supports finding that termination is in child's best interest and that "factfinder may give great weight to this significant factor"); *In re A.A.H.*, Nos. 01-19-00612-CV & 01-19-00748-CV, 2020 Tex. App. LEXIS 1915, *37 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) (explaining that "parent's past conduct is probative of his future conduct when evaluating the child's best interest" and that "factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child"); *A.C.*, 577 S.W.3d at 705–06 (noting that "factfinder is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination"); *In re*

*M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (stating that "factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent").

Mother did not articulate any plans for her children's future care or well-being except to state that she hoped to continue doing what she had been doing, from which the trial court could have inferred that her continued parenting of the children would subject them to danger or neglect. In contrast, the Department was in the process of approving an adoptive foster home in California for the four eldest children. The foster mother had previously cared for the children and was "all in" for them. While Mother testified that she had a suitable home for the children, she had not allowed the Department to corroborate her representation.

Viewing the evidence under the legal-sufficiency standard of review, we conclude that the trial court could have formed a firm belief or conviction that terminating the parental rights of Mother was in her four eldest children's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *A.C.*, 560 S.W.3d at 630–31. Further, viewing the evidence under the factual-sufficiency standard of review, we conclude that the disputed evidence a reasonable factfinder could not have credited in favor of the finding is not so significant that the factfinder could not have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of her eldest four children. *See A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's second issue.

### *Conservatorship of Albert*

In her third issue, Mother contends that the trial court's appointment of A.W. Sr. as Albert's sole managing conservator and failure to appoint her as managing or possessory

conservator of Albert was arbitrary and unreasonable. The best interest of the child is the court's primary consideration in determining the issues of conservatorship and possession of and access to a child. *See* Tex. Fam. Code § 153.002. We review conservatorship determinations for abuse of discretion and will reverse them only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Furthermore, a trial court does not abuse its discretion in making a conservatorship determination if there is some evidence of a substantive and probative character to support its decision. *In re K.S.*, 492 S.W.3d 419, 426 (Tex. App.— Houston [14th Dist.] 2016, pet. denied). In this case, the trial court had much evidence from which to determine the conservatorship that it deemed to be in Albert's best interest.

We have already determined that the evidence was legally and factually sufficient to support the trial court's finding that termination of Mother's rights to her four eldest children was in their best interest; because Albert had been living with Mother and his siblings when the aforementioned endangering conduct occurred, it follows that the same evidence supports the trial court's determination that it is in Albert's best interest that Mother not be appointed as his conservator, especially considering that the standard of review for conservatorship is less stringent than that for termination. *See J.A.J.*, 243 S.W.3d at 616. Furthermore, Mother had failed to enroll Albert in school, and Albert had expressed to the guardian ad litem that he wished to live with A.W. Sr. The only negative evidence about A.W. Sr. was Mother's non-specific testimony about his "illegal activities" (which the trial court could have found not credible) and A.W. Sr.'s failure to participate in individual counseling and complete a psychological examination at his expense. We conclude that there was evidence of a substantive and probative character to support the trial court's conservatorship determination and that the determination

16

was not arbitrary or unreasonable and did not, therefore, constitute an abuse of discretion. We accordingly overrule Mother's third issue.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's order of termination.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   January 5, 2022