# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00440-CV

**N. M. and C. M., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 27TH DISTRICT COURT OF LAMPASAS COUNTY
### NO. 22719, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

N.M. (Father) and C.M. (Mother) appeal from the trial court's final order, rendered after a jury trial, terminating their parental rights to their three children. At trial the children were ages eleven, seven, and five.[1] Father challenges the sufficiency of the evidence to support the three statutory-predicate grounds the jury found to support the termination of his parental rights. Mother challenges the sufficiency of the evidence to support the jury's finding that termination of her parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). For the following reasons, we affirm.

## APPLICABLE LAW AND STANDARD OF REVIEW

To terminate parental rights, the Department must prove both (1) one of the statutory-predicate grounds and (2) that termination is in the best interest of the child. *See* Tex.

---

[1] Neither Mother nor Father appeared for trial, but each was represented by separate appointed counsel.

Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

Reviewing the legal sufficiency of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack and considering undisputed contrary evidence to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). The factfinder has a right to disbelieve any witness's testimony. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at \*15 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). And it is the factfinder's role to draw any reasonable inferences from the evidence that it chooses and to choose between conflicting reasonable inferences. *See In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022); *B.D. v. Texas Dep't of*

2

*Fam. & Protective Servs.*, No. 03-20-00118-CV, 2020 WL 5100641, at \*17 (Tex. App.—Austin Aug. 28, 2020, pet. denied) (mem. op.).

**FATHER'S ISSUE**

In his sole issue, Father challenges the sufficiency of the evidence to support the three statutory-predicate grounds found by the jury. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). We begin with a review of the jury's endangerment findings because of their significant collateral consequences. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (explaining that appellate court must review sufficiency of evidence supporting (D) or (E) grounds when parent has presented issue because endangerment findings can be used as basis for termination in subsequent proceedings involving other children). Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 698–99 (Tex. App.—Austin 2019, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699.

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *J.W.*, 645 S.W.3d at 749 (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and

3

convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *N.G.,* 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)). A parent's illegal drug use may constitute endangerment under Subsection (E). *A.C.*, 577 S.W.3d at 699. Similarly, the conduct of a parent or other person in the home—including inappropriate, abusive, or unlawful conduct—is part of the "conditions or surroundings" of a child's home and can create an environment that endangers the physical or emotional well-being of a child under Subsection (D). *See S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 253–54 (Tex. App.—Austin 2022, pet. denied).

In this case, we will focus our analysis on (D). The jury saw photographs, watched videos,[2] and heard undisputed testimony depicting a filthy and unsanitary home in which the children were living with Mother and Father. The conditions included raw sewage on the floor leading into the children's bedroom; "horrendous" odors in the home similar to "decomposing flesh, like a dead body"; piles of waist-high garbage and debris throughout the home; safety hazards such as sharp objects on the floor while children were barefoot; multiple bottles of liquor, opened and still containing liquor, within easy access of the children in the living room; and dog feces smeared on the walls, in the bathroom sink, and on the floors— including in the children's bedroom. The children's bedroom had no beds but only pillows and blankets on the floor. One officer testified that the hallway floor "kind of squish[ed]" beneath his feet from all of the dirty water on it and that in the "tens of thousands of homes" he had seen

---

[2] Some of the videos were body-cam footage from the law-enforcement officers who arrived at the home to execute a writ of possession, and the others were home videos that Father recorded and voluntarily provided to law enforcement.

in his career, Father and Mother's was "one of the worst." The outside of the home looked like a "salvage yard," with many inoperable vehicles and refuse strewn everywhere.

Video evidence showed Father and Mother using drugs in the home, likely methamphetamine, while the children were in the home and perhaps even in the same room, and Father was known to local law enforcement to be paranoid, to have mental-health issues, to use methamphetamine, and to brandish guns in the home's yard when he believed intruders were approaching. Law enforcement had responded to seventy-four calls from Father and Mother over the five years preceding the children's removal, many of which were for reports of suspicious persons near the home, but law enforcement never found evidence of such persons having been present. On more than one occasion, Father had fired his gun into the yard or into bushes, believing that he was protecting the home from trespassers. Several of the videos admitted into evidence were home videos recorded by Father and voluntarily provided to law enforcement to prove his claims about trespassers. One of the officers who had responded to calls at the home testified that Father was erratic and had "all the signs of a person that abuses substances." The family had been investigated by the Department three times, Father had tested positive for methamphetamine use in two of those investigations, and Father had admitted to methamphetamine use in 2017 and 2021.

The jury watched videos depicting Father's verbal abuse of the children, including repeated cursing at them and use of threatening tones and language—such as "if you touch your fucking sister again, I'm gonna beat your ass"—to get the children to behave. When law enforcement arrived at the home to execute on a writ of possession to evict the family, they found methamphetamine-making and methamphetamine-smoking supplies and paraphernalia including pipes, syringes, and blowtorches as well as firearms located within easy, unlocked

reach of the children. The officers' visit prompted a call to the Department, which resulted in the children's removal. Department witnesses described the children when they came into its care as being "feral"; lacking basic hygiene care and knowledge, such as how to use toilet paper; and as being filthy and unkempt, with feces smeared on their legs. Father and Mother reported a monthly income of about $8,000, paid by the Veterans Administration for disability, but the parents' disabilities were never made known to the Department despite its request for their medical records and lists of medications. Father and Mother had not appeared to do any packing or other preparation for the eviction, despite having had ample notice.

Based on our review of the record, we conclude that legally and factually sufficient evidence supports the jury's Subsection (D) endangerment finding and, because only one statutory-predicate ground need be established, *see A.V.*, 113 S.W.3d at 361, we dispense with a lengthy explanation of our decision and also with addressing Father's challenges to the (E) and (O) grounds, *see* Tex. R. App. P. 47.1, 47.4. We accordingly overrule Father's sole issue.

## MOTHER'S ISSUE

In her sole issue, Mother challenges the sufficiency of the evidence to support the jury's finding that termination of her parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). When reviewing best-interest findings, factors that courts consider include (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent–child relationship is improper, and (9) any

6

excuses for the parent's conduct. *J.W.*, 645 S.W.3d at 746. This list of factors is not exhaustive, not all of them need be proven to determine a child's best interest, and proof of only one factor may be adequate in a particular factual context to support termination. *See M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *5 (Tex. App.— Austin Feb. 16, 2023, no pet.) (mem. op.); *S.C.*, 2020 WL 3892796, at *16. Evidence probative under the statutory-predicate grounds may be probative of best interest as well. *A.C.*, 560 S.W.3d at 631–32.

The evidence of the conditions of the children's home that they shared with their parents; of Father's and Mother's drug use in the home; of Father's verbal abuse of the children in Mother's presence; of the easily accessible firearms, alcohol, and drug supplies; and of Mother's near-complete refusal to comply with her court-ordered family service plan carries much weight for termination under several of the factors, especially the third through ninth. Other evidence under those same factors included videos depicting Mother's and Father's drug use and a police officer's testimony describing videos he watched that Mother and Father had recorded of themselves showing Mother walking around with a pipe, smoking a "white substance," and then using a glove to "stick" the substance "up [Father's] rectum." Based on the videos, the officer concluded that Mother and Father were "using a welding torch to free-base cocaine or methamphetamine." When the officer spoke with Mother the day of the children's removal, Mother "did not recognize that there was a problem with the condition of the home or the [drug] paraphernalia . . . or the alcohol containers that were found within easy access of the children." Mother also "did not articulate any plan to correct any of those things."

Regarding the first factor—the children's wishes—evidence showed that the children were improving in their placement in Nevada with their paternal grandfather and his

wife, with whom they had bonded and felt safe. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."); *accord J.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00583-CV, 2023 WL 2169492, at *5 (Tex. App.—Austin Feb. 23, 2023, no pet.) (mem. op.). The two older children told the caseworker that they believe their grandfather and his wife "saved them" and they would not know where they would be today if they had not saved them. The eldest told the caseworker that she wanted to stay with her grandfather and his wife and that she did not know where she would want to go if that is not possible. The eldest also had expressed a desire to change her name. The grandfather and his wife were planning to adopt the three children. The children's attorney ad litem testified that the children want to remain in their grandfather's home, where they have consistency, rules, and a normal routine for the first time and are thriving. The attorney ad litem believes that having their maternal grandmother in their lives is a positive for the children and that contact with her should continue, and she believed the paternal grandfather would continue to allow such contact should he adopt the children. During their visitations with Mother and Father, the children would cry a lot and fight with each other.

As for factors two through five, in addition to the already-discussed deplorable conditions of the home, evidence showed Mother's complicity in Father's verbal abuse of the children as well as Mother's refusal to participate in and complete most of her court-ordered services. Although Mother completed her court-ordered psychological exam, the examining psychologist described Mother as being unwilling to acknowledge any responsibility for her children's situation, blaming CPS or her children for all of her problems. The psychologist

8

testified that Mother spoke aggressively and argumentatively with him for "up to two hours." He further testified that Mother's physical and cognitive functioning and deterioration in lifestyle and personal functioning strongly indicated methamphetamine addiction, which is "an evil substance" that "really destroys the brain over time." When asked by the psychologist about her drug use, Mother refused to speak with him about it and wrote "NA in huge letters across the [intake questionnaire] page" inquiring about drug use. A Department caseworker testified that the grandparents in Nevada had many programs available to help them find resources and assist with supporting the children, including a program that is "like a mentor program for foster parents." The grandfather and his wife had been receiving assistance from the program, including obtaining individual therapy for the children, and they had outfitted their home and yard with age-appropriate toys and activities for the children.

A caseworker testified that when the children were removed, the eldest was exhibiting "parentified" behavior,[3] the middle child regularly growled and hissed at people, and the youngest was not potty trained and did not speak clearly. The children physically fought with one another, and their relationship was "strained." Since removal, the eldest child had received some of the support and assistance she needed, including medication for insomnia and ADHD. She had been temporarily placed in a psychiatric hospital while this case was pending because she had been engaging in self-harm. The middle child is now less "weepy and whiny," and she no longer growls and hisses at people; the youngest is potty trained and speaking well. The caseworker testified that all three children "seem happier" and "more lively" than they were at the beginning of the case, and they are "calmer" and "nicer" to each other now.

---

[3] "Parentification" is the process of role reversal whereby a child or adolescent is obliged to act as a parent to their own parent or sibling. *See Parentification*, *Wikipedia*, https://en.wikipedia.org/wiki/Parentification (last visited Oct. 30, 2023).

Regarding the sixth factor, as neither Mother nor Father testified at trial, participated in most of their services, or cooperated with the Department while the case was pending, no evidence was presented as to Mother's or Father's plans for the children. Additionally, despite claiming to receive about $8,000 per month in disability payments, Mother and Father had not paid any of the court-ordered child support while the case was pending. In contrast, and as already noted, the grandfather and his wife hope to adopt the children and had enrolled them in school for the fall, had found tutoring services for the eldest, had enrolled the younger two in gymnastics, and had rearranged their schedules and outfitted their home to accommodate the children. Regarding the seventh factor, the caseworker testified that termination of Mother's and Father's rights and adoption by the grandfather and his wife would provide the children with the stability they need. The children's maternal grandmother lives a few hours from the grandfather, is bonded to the children, and hopes to maintain contact with them and help with their care as much as possible. Although there was evidence that at one point the grandfather had asked the Department whether the eldest could be placed elsewhere temporarily because the grandfather was struggling with her behavior and wanted her to receive the help she needed, the child had never been informed of such possibility, the grandfather had ultimately decided to have the child remain in his home after discussing the matter with therapists, and she had since improved.

Regarding the last two factors, the inappropriate parental conduct of Mother and Father discussed above—illegal drug use, severely neglectful care of the home and children, and verbally abusive communications to the children—indicates that the parent–child relationship is improper, and Mother did not provide any excuses for her conduct except to blame her children or the Department. Further, the testifying psychologist testified that Mother refused to accept

10

responsibility for the family's situation and did not appear willing to address any of the Department's concerns, having failed to appear for court-ordered drug testing, participate in individual therapy, and complete the psychologist's recommendations. And evidence of domestic violence between Mother and Father, resulting in Mother calling law enforcement to the home on more than one occasion, was presented.

In sum, the evidence in favor of terminating Mother's parental rights was significant, constituting both legally and factually sufficient evidence to support the jury's best-interest finding. We accordingly overrule Mother's sole issue.

## CONCLUSION

Having overruled Mother's and Father's issues, we affirm the trial court's termination order.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: November 1, 2023

11